NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 07a0433n.06
Filed: June 21, 2007

**United States Court of Appeals**
**FOR THE SIXTH CIRCUIT**

_____

No. 03-2561

_____

| | | |
|---|---|---|
| Davidson Momah, | * | |
| | * | |
| Plaintiff - Appellant, | * | |
| | * | Appeal from the United States |
| v. | * | District Court for the Eastern |
| | * | District of Michigan. |
| Cari M. Dominguez, Chair, United | * | |
| States Equal Employment Opportunity | * | |
| Commission; Equal Employment | * | |
| Opportunity Commission, | * | |
| | * | |
| Defendants - Appellees. | * | |

_____

Submitted: April 26, 2005
Filed:

_____

Before GUY, BATCHELDER, and JOHN R. GIBSON,[1] Circuit Judges.

_____

JOHN R. GIBSON, Circuit Judge.

_____

[1]The Honorable John R. Gibson, United States Circuit Judge for the Eighth Circuit Court of Appeals, sitting by designation.

Davidson Momah filed a complaint against the EEOC in federal court alleging discrimination and retaliation in violation of Title VII of the Civil Rights Act of 1964. The district court granted summary judgment for the EEOC, which this court affirmed in 2006. Momah v. Dominguez, No. 03-2561, 175 Fed. Appx. 11 (6th Cir. 2006). Following a petition for certiorari filed by Momah, the United States Supreme Court vacated our decision in light of Burlington Northern & Santa Fe Railway Co. v. White, – U.S. – , 126 S. Ct. 2405 (2006), and remanded to this court. Momah v. Dominguez, – U.S. – , 127 S. Ct. 933 (2007). While White changes our analysis regarding Momah's retaliation claim, it does not change our conclusion that the district court's grant of summary judgment was proper. We again AFFIRM the district court.

Davidson Momah, who is black, was born and raised in Nigeria. He came to the United States in 1980 to attend college and later obtained his law degree. In April 1994, he began working as an investigator in the Detroit, Michigan office of the EEOC. During his three years as an investigator in Detroit, Momah received periodic promotions and favorable evaluations from his supervisors. In early 1997, Momah applied for and was selected to fill a vacant Administrative Judge position in the EEOC's Memphis, Tennessee office.[2] When Momah moved to Memphis his wife and daughter remained in Detroit, but it was his intention that they would join him in Memphis once he found a house for the family. However, in June 1997, Momah was hospitalized after being physically assaulted by a white supremacist at a gas station. Traumatized by the attack on her husband and fearful of further attacks, Momah's wife became unwilling to relocate to the South, and she demanded that he request to be transferred back to Detroit. Although Momah initially refused, he eventually relented when his daughter began to experience health problems.

---

[2]An EEOC Administrative Judge hears and decides, at the administrative level, complaints brought by federal employees alleging unlawful discrimination by their employers.

2

While visiting his family over the 1997 Christmas season, Momah met with officials at the Detroit office to discuss the possibility of a hardship transfer to a vacant Administrative Judge position in Detroit. The director of the Detroit office, James Neely, told Momah that although he would like to bring him back, he did not have the authority to do so. However, Neely did explain the process by which Momah could request a transfer through EEOC headquarters in Washington, D.C. On Neely's advice, Momah sent a letter to headquarters requesting a hardship transfer to Detroit. When Ralph Soto at EEOC headquarters received the request, he contacted Walter Grabon, the director of the Memphis office where Momah was then working as an Administrative Judge. Grabon opined to Soto that Momah's request should be denied. By letter dated February 3, 1998, EEOC headquarters notified Momah that it "was unable to grant [the] request for reassignment to the Detroit District Office at this time." The letter, signed by Soto, stated that the denial was "due to the current workload and staffing levels in the Memphis District Office" and that the requested reassignment "would not serve our current operational needs," although it did inform Momah that headquarters would "be happy to reconsider your transfer request if there is a change in the [Memphis office's] workload and staffing situation."

Around the time of the denial, Momah met with Grabon, who told Momah that he would need him around for at least six months to help reduce the backlog at the Memphis office before Grabon would support any reassignment request. Momah reluctantly agreed to this arrangement. Approximately six months later, Momah again met with Grabon to discuss the possibility of a hardship transfer. By this time, Momah's daughter had been diagnosed with scoliosis, a condition requiring treatment by specialists in Detroit and Chicago. Momah showed Grabon a letter that he later sent to EEOC headquarters recounting his daughter's medical problems and pleading for urgent action on his transfer request. In the letter Momah stated his willingness to transfer to any position in Detroit, including a temporary assignment as an Administrative Judge or even into his former position as an investigator. Momah also

3

promised to pay his relocation expenses and offered to take the cases assigned to him for processing in Memphis with him to Detroit if he were permitted to go. Grabon told Momah not to bother making the request because it would not be approved, but that he should contact headquarters directly about the matter. During the conversation Momah informed Grabon that he was aware that a white male Administrative Judge had been granted a hardship transfer from EEOC headquarters to the Little Rock office of the EEOC in order for him to be closer to his adopted son. Grabon told Momah not to believe rumors about transfers of other EEOC employees.

Sometime after Momah submitted the transfer request to headquarters, Neely convened a meeting at the Detroit office to discuss Momah's request. In attendance were Andrew Sheppard, deputy director of the Detroit office, and Gail Cober, enforcement manager in Detroit. Sheppard, a black male, told Neely that he had no problem with Momah's returning to Detroit, but Cober, a white female, objected. Momah claims that following this meeting, Cober and Administrative Judge Mimi Gendreau, another white female in the Detroit office, began mounting pressure on Neely to convince headquarters to deny Momah's transfer request. Like Cober, Gendreau objected to Momah's return and voiced her objections to Sheppard and Neely, even going so far as to tell Sheppard that she would rather resign than ever work with Momah again.

While his request was pending in August 1998, Momah flew to EEOC headquarters to meet with Soto in person to discuss the possibility of a transfer. Momah relayed his daughter's health condition, his willingness to accept any assignment in the Detroit office including a temporary detail or an investigator position, and his willingness to bear his own relocation expenses. However, Soto told Momah that Detroit did not need any additional staff due to low inventory. Following the meeting with Soto, Momah went to the office of Elizabeth Thornton, one of Soto's superiors, to discuss his situation. After listening to his concerns, Thornton told Momah that the low inventory in Detroit made a transfer there

4

impossible. She suggested that Momah consider a transfer to the Indianapolis office, since it was closer to Detroit than Memphis, just to keep his options open.

In a letter dated September 8, 1998, Momah's second request for a hardship transfer was formally denied. The letter, signed by Soto, stated that a transfer as either an Administrative Judge or as an investigator in the Detroit office would "not be possible ... at this time." It indicated that Momah's request had been discussed with Neely, who had determined that "a reassignment [to the Detroit office] is not commensurate with the district's needs." According to Soto, he had asked one of his subordinates, Marilyn Hayes, to contact Neely regarding Momah's request. According to Hayes, Neely told her that "the Detroit office did not want [Momah] back" and "he was not welcome back" because "they had had problems with him when he had been there." After learning that his request had been denied, Momah contacted Neely directly. Neely admitted to Momah that headquarters had contacted him about Detroit's inventory, but that the ultimate decision of whether to grant or deny his transfer request was made out of headquarters. In October, Momah met with Neely personally at the Detroit office, and Neely again told Momah that he was not responsible for the denial and that all he did was inform headquarters about inventory levels at the Detroit office. Later in October, Momah contacted Soto and asked if he would reconsider the denial. Soto told him, "Mr. Momah, you are not going to Detroit." In November, Momah met with Grabon, who denied any role in the denial and told Momah to take up the issue with Neely and headquarters. In the ensuing months Momah had a number of conversations with Grabon about his desire to transfer to Detroit during which he informed Grabon that he believed "what they were doing to [him] was discriminatory."

In September 1999, approximately one year after Momah's second request for a hardship transfer had been denied, Momah learned that a white investigator, Daniel Dushman, had been granted a hardship transfer to the Detroit office. Dushman was an investigator in the Detroit office during the time Momah had worked there. In

5

early 1999, Dushman had requested and was granted a hardship transfer from Detroit to the EEOC office in Alberquerque, New Mexico. Less than seven months later, Dushman wrote to Thornton at EEOC headquarters requesting a hardship transfer back to Detroit on account of family problems. Despite his being demoted while working as an investigator in Detroit and his acknowledged performance problems at the Alberquerque office, Dushman's transfer request was approved. After learning of Dushman's transfer, Momah contacted numerous EEOC officials in late September and early October 1999 to renew his request for a transfer. He contacted Jacqueline Bradley, the director of field management programs, and Marilyn Hayes, both at EEOC headquarters, to determine the status of any vacancies in the Detroit office, as well as the current inventory levels there. He made similar inquiries of Neely in the Detroit office. According to Momah, the officials informed him that the situation had not changed since his initial request and that his request continued to be denied.

On or about October 13, 1999, Momah initiated contact with an EEO counselor, claiming that the denials of his transfer requests were discriminatory. After the informal process failed, Momah filed a formal complaint with the EEO on November 24, 1999, claiming that his repeated requests for a transfer had been denied on account of his race, color, national origin, gender, and disability, and in retaliation for his exercise of rights protected under Title VII. Momah's complaint also alleged that the EEOC, for discriminatory and/or retaliatory reasons: (1) revoked, in September 1998, an offer to transfer him to an Administrative Judge position in Indianapolis; (2) in November 1998 rated his performance as "proficient" instead of "outstanding"; (3) delayed his promotion from GS 13 to GS 14 from December 1999 to January 2000; and (4) delayed his promotion from GS 12 to GS 13 from December 1998 to February 1999. The EEO notified Momah by letter dated May 26, 2000, that the agency was not accepting for investigation claims (1), (2), and (4) for failure to initiate contact with an EEO counselor within forty-five days after they occurred. However, the EEO accepted for investigation his claims regarding the denial of his

transfer requests and the delay of his most recent promotion and informed him that his denial of transfer claim was being treated as a continuing violation.

During the course of the EEO investigation, Momah learned that the EEOC had granted several requests from white females to transfer while his requests were still pending. Deborah Barno, a trial attorney in the Detroit office, was assigned temporarily to the vacant Administrative Judge position in Detroit. During the time that Momah's transfer request was pending, Judith Fournalik requested and was granted a hardship transfer from the New York EEOC office to an investigator position in the Detroit office in order for her to be closer to the law school in Ohio she was then attending. In addition, Linda Stankovich was allowed to return to the Detroit office to a different position than the one she had previously held, and Tina Hoffman, who had earlier resigned her position as budget analyst in the Detroit office, was allowed to return on a contract basis.

In April 2000, the EEOC offered Momah a transfer to an Administrative Judge position in the Indianapolis office of the EEOC in order for him to be closer to his family. Momah accepted the transfer and moved to Indianapolis. He claims that he did so based on representations by EEOC officials that the transfer to Indianapolis was temporary and that he would be transferred to Detroit as soon as a position became available there. Momah was unhappy in Indianapolis, describing his experience there as "a nightmare" due to conflicts with his supervisors over his use of personal time to travel to Detroit to see his family. During his time in Indianapolis, Momah periodically renewed his request for a transfer to Detroit. He sent a letter dated May 25, 2000, to Elizabeth Thornton at EEOC headquarters requesting a hardship transfer from Indianapolis to Detroit. On June 9, 2000, Momah, accompanied by his attorney, traveled to EEOC headquarters to discuss his request with Jaqueline Bradley. While acknowledging the difficulty of Momah's personal situation, Bradley told Momah that a transfer to Detroit would not be possible due to budgetary constraints and the lack of a vacancy in the Detroit office. Momah's

7

attorney inquired as to the likelihood of a transfer to the Cleveland office or back to Memphis, but Bradley rejected both requests: the former on the basis that the Cleveland office was overstaffed, the latter due to budgetary reasons. By letter dated June 27, 2000, Elizabeth Thornton informed Momah that his request for a hardship transfer from Indianapolis to Detroit was denied on the grounds that there were no funded vacancies in the Detroit office. By letter of July 14, 2000, to Thornton, Momah requested that she reconsider the earlier denial, and by letter dated August 20, 2000, he again requested a hardship transfer. Thornton responded by letter dated August 24, 2000, that the situation had not changed and that there continued to be no vacancies in the Detroit office.

Momah took a medical leave of absence for depression and work-related stress in approximately September 2000; he returned to work as an Administrative Judge at the Indianapolis office on April 9, 2001. Shortly after his return, the EEOC received funding to permanently fill the Administrative Judge position in Detroit to which Debra Barno had been assigned on a temporary basis. Momah applied for the position and was considered along with the other applicants. However, he was not selected; instead, Neely selected Debra Barno for the Administrative Judge position. In October of 2001, Momah was granted a transfer from the Indianapolis office back to the Memphis office as an Administrative Judge. However, after accepting the transfer, a disagreement erupted between Momah and EEOC headquarters over who would bear the costs of relocation and when Momah was expected to report for duty. Shortly after this disagreement, Momah notified headquarters that he was rejecting the transfer to Memphis, stating that "it is in my best interest to remain in the Indianapolis District Office until all the issues raised in my complaints are resolved either by an impartial official within the [EEOC] or before the federal court."

Following the investigation into Momah's complaint, the EEOC issued its Final Action on June 4, 2002. It affirmed the EEO's refusal to investigate Momah's untimely claims, but went on to address the merits of his claims that (1) since January

8

1998 he has been denied a hardship transfer to Detroit and that (2) his promotion was delayed, all on account of his race, color, national origin, gender, disability, and in retaliation for his engaging in activity protected under Title VII. With respect to his disability discrimination claim, the EEOC concluded that Momah had failed to establish that he was a qualified individual with a disability. With respect to his retaliation claim, the EEOC concluded that he failed to make out a prima facie case because he presented no evidence that those involved with his transfer or promotion were aware that he had engaged in any protected activity. The EEOC concluded that Momah had failed to establish a prima facie case of discrimination on account of race, color, or national origin on his denial of transfer and delay of promotion claims because he failed to present evidence that employees not in a protected class were treated more favorably than he. On his delay of promotion claim, the EEOC concluded that Momah had also failed to make out a prima facie case because he failed to show that he suffered an adverse employment action in that he received his promotion on the first day he was eligible. With respect to his denial of transfer claim, the EEOC concluded that, even if Momah could make out a prima facie case of discrimination, he failed to present evidence that the agency's reason for denying his transfer—namely that there were no available positions in Detroit—was a pretext for discrimination.

Momah filed the present complaint against the EEOC in federal court on August 30, 2002, alleging violations of Title VII of the Civil Rights Act of 1964, 42 U.S.C. 2000, et seq.; the Rehabilitation Act of 1973, 29 U.S.C. § 791; 42 U.S.C. § 1983; the Westfall Act, 28 U.S.C. § 2679(b)(1); the Federal Tort Claims Act, 28 U.S.C. § 2673; unspecified "EEOC Rules and Regulations"; Washington D.C. Civil Rights Law; as well as breach of contract claims under Michigan and Washington D.C. common law. The EEOC filed a motion to dismiss, which the district court denied as to the Title VII and Rehabilitation Act claims, but granted as to the remaining claims. Following discovery, the EEOC moved for summary judgment.

9

The district court issued a bench opinion following a hearing and a written order the following day granting the EEOC's motion for summary judgment in its entirety.

We review the district court's grant of summary judgment de novo. Johnson v. Kroger Co., 319 F.3d 858, 864 (6th Cir. 2003). In reviewing summary judgment, we look at the record in the same fashion as the district court, Guarino v. Brookfield Twp. Trustees, 980 F.2d 399, 403 (6th Cir. 1992), and our review "is limited to the evidence before the district court when it ruled." Campbell v. Potash Corp. of Sask., Inc., 238 F.3d 792, 797 (6th Cir. 2001). Summary judgment is appropriate only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). We view all evidence before us in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). A genuine issue of fact exists when there is "sufficient evidence favoring the non-moving party for a jury to return a verdict for that party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986). Once the movant has pointed to evidence in the record showing that there are no genuine issues of material fact, the non-moving party must respond setting forth specific facts showing there is a genuine issue for trial. Guarino, 980 F.2d at 405 (quoting Rule 56(e)).

The EEOC argues and the district court concluded that Momah's failure to initiate timely contact with an EEO counselor bars his claim that the EEOC discriminated against him by denying his requests for a hardship transfer. A federal employee suing under Title VII must satisfy "rigorous administrative exhaustion requirements and time limitations." McFarland v. Henderson, 307 F.3d 402, 406 (6th Cir. 2002) (quoting Brown v. Gen. Servs. Admin., 425 U.S. 820, 833 (1976)). Relevant here is the requirement that an "aggrieved [federal employee] must initiate contact with a[n] [EEO] Counselor within 45 days of the matter alleged to be

discriminatory or, in the case of personnel action, within 45 days of the effective date of the action." 29 C.F.R. § 1614.105(a)(1). Timely contact with an EEO counselor is an administrative prerequisite to filing an employment discrimination claim in federal court. Horton v. Potter, 369 F.3d 906, 910 (6th Cir. 2004); McFarland, 307 F.3d at 406.

We conclude that even if Momah failed to initiate timely contact with an EEO counselor, the EEOC waived its untimeliness defense by addressing the merits of his denial of transfer claim at the administrative level without raising a timeliness objection. In a recent Title VII case by a federal employee, we held that "when an agency accepts and investigates a complaint of discrimination ... it does not thereby waive a defense that the complaint was untimely." Horton, 369 F.3d at 911 (citing Belgrave v. Pena, 254 F.3d 384, 387 (2d Cir. 2001)); see also Ester v. Principi, 250 F.3d 1068, 1072 n.1 (7th Cir. 2001); Bowden v. United States, 106 F.3d 433, 438 (D.C. Cir. 1997); Rowe v. Sullivan, 967 F.2d 186, 191 (5th Cir. 1992); Boyd v. United States Postal Serv., 752 F.2d 410, 414 (9th Cir. 1985). However, we recognized that waiver would occur "when the agency decides the complaint on the merits without addressing the untimeliness defense." Id. (citing Ester, 250 F.3d at 1071-72; Bowden, 106 F.3d at 438). Here, although the EEO addressed the untimeliness defense with respect to three of the five claims in Momah's formal complaint, it decided the merits of Momah's denial of transfer claim. Later, in its Final Action, the agency affirmed the untimeliness determinations as to three of the five claims, but again decided Momah's denial of transfer claim on the merits. It was only in support of its motion to dismiss Momah's federal complaint that the EEOC asserted that the denial of transfer claim was untimely. In these circumstances we conclude that the agency waived any timeliness objection, and therefore Momah's denial of transfer claim is properly before us. See Horton, 369 F.3d at 911; see also Ester, 250 F.3d at 1071-73 (discussing "strong policy considerations" underlying the rule that agency waives untimeliness defense by failing to address it at administrative level).

Title VII makes it unlawful for an employer "to ... discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). A Title VII plaintiff may establish discrimination either by introducing direct evidence of discrimination or circumstantial evidence supporting an inference of discrimination. Johnson, 319 F.3d at 864-65. Momah argues that he has presented direct evidence that his requests for a hardship transfer were denied for discriminatory reasons. "[D]irect evidence is that evidence which, if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions." Id. at 865 (quoting Jacklyn v. Schering-Plough Healthcare Prods. Sales Corp., 176 F.3d 921, 926 (6th Cir. 1999)). Unlike circumstantial evidence, it "does not require a factfinder to draw any inferences in order to conclude that the challenged employment action was motivated at least in part by prejudice against members of the protected group." Id. Direct evidence of discrimination "must establish not only that the plaintiff's employer was predisposed to discriminate . . . , but also that the employer acted on that predisposition." DiCarlo v. Potter, 358 F.3d 408, 415 (6th Cir. 2004) (quotation omitted).

Momah's purported direct evidence of discrimination consists of comments by Gail Cober and Mimi Gendreau regarding his African accent and his poor command of the English language. Viewing the evidence in the light most favorable to Momah, a jury could possibly conclude that Cober and Gendreau's comments were discriminatory. Nonetheless, Momah's contention that these comments constitute direct evidence of discrimination fails because neither Cober nor Gendreau were responsible for the allegedly discriminatory employment action—the denial of his transfer requests. Carter v. Univ. of Toledo, 349 F.3d 269, 273 (6th Cir. 2003) ("[C]omments made by individuals who are not involved in the decision-making process regarding the plaintiff's employment do not constitute direct evidence of

12

discrimination."); Hopson v. DaimlerChrysler Corp., 306 F.3d 427, 433 (6th Cir. 2002) (comments by manager lacking involvement in the decision-making process do not constitute direct evidence); Ercegovich v. Goodyear Tire & Rubber Co., 154 F.3d 344, 354-55 (6th Cir. 1998) ("An isolated discriminatory remark made by one with no managerial authority over the challenged personnel decisions is not considered indicative of age discrimination"). Momah responds that even if Cober and Gendreau did not have ultimate authority over his transfer requests, their vocal opposition to his return to Detroit so influenced Neely as to render them the de facto decisionmakers. However, this contention fails in two respects. First, the undisputed evidence demonstrates that although Neely had significant input into the decisionmaking process, the ultimate decision of whether to grant Momah's request was made out of EEOC headquarters in Washington, D.C. Second, even if we were to assume that Neely's input was outcome-determinative, there is no evidence that Neely's input was affected by pressure from Cober and Gendreau, instead of simply reflecting his own views about the Detroit office's personnel needs. Because Momah has failed to present evidence that Cober and Gendreau were responsible for headquarters' denial of his transfer requests, their comments, no matter how insensitive, cannot constitute direct evidence that his requests were denied for discriminatory reasons.

Because Momah has failed to present direct evidence of discrimination, he must proceed under the burden-shifting approach first set out in McDonnell-Douglas Corp. v. Green, 411 U.S. 792 (1973), and later refined by Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248 (1981). Johnson, 319 F.3d at 865. Under this framework, the Title VII plaintiff must carry the initial burden of establishing by a preponderance of the evidence a prima facie case of unlawful discrimination. DiCarlo, 358 F.3d at 414. The prima facie case creates a rebuttable presumption of discrimination requiring the defendant to articulate a legitimate, nondiscriminatory

13

reason for the challenged action. Id. If the defendant meets this burden, the plaintiff must prove that the proffered reason was a pretext for unlawful discrimination. Id.

To establish a prima facie case under Title VII, Momah must demonstrate that (1) he was a member of a protected class; (2) he suffered an adverse employment action; (3) he was qualified for the position; and (4) he was treated differently than similarly-situated, non-protected employees. DiCarlo, 358 F.3d at 415 (6th Cir. 2004) (quotation omitted). Undisputed evidence demonstrates that Momah is a member of several classes protected by Title VII: he is a black (race) male (gender) from Nigeria (national origin).[3] Likewise, Momah produced evidence that he was qualified for both the Administrative Judge and investigator positions in Detroit to which he repeatedly requested transfer. Moreover, there is evidence from which a jury could conclude that non-protected, but similarly-situated, employees were treated more favorably than Momah.[4]

---

[3]Momah argued to the district court that he was discriminated against on account of disability in violation of the Rehabilitation Act. However, he does not raise this issue on appeal, and so has abandoned it. See Kocsis v. Multi-Care Mgmt., Inc., 97 F.3d 876, 881 (6th Cir. 1996).

[4]The record demonstrates that: (1) Dan Dushman, a white male, was granted a hardship transfer to an investigator position in Detroit; (2) Deborah Barno, a white female, was assigned temporarily to the vacant Administrative Judge position in Detroit; (3) Judith Fournalik, a white female, was granted a hardship transfer to an investigator position in the Detroit office; (4) Linda Stankovich, a white female, was allowed to return to the Detroit office to a different position than the one she had previously held; and (5) Tina Hoffman, a white female, was allowed to return to the Detroit office on a contract basis after earlier having resigned. See Ercegovich, 154 F.3d at 352 (holding that comparables need not be identical; rather, they need only be similarly situated "in all of the relevant aspects").

14

Although Momah has established three elements of his prima facie case, he has not demonstrated that the denials of his requests for a purely lateral transfer were "adverse employment actions" actionable under Title VII. We have previously held that an "adverse employment action" is one that results in a "materially adverse change in the terms and conditions of [plaintiff's] employment." Hollins v. Atlantic Co., 188 F.3d 652, 662 (6th Cir. 1999); Kocsis, 97 F.3d at 886. A "materially adverse" change in the terms or conditions of employment is typically characterized "by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation." Hollins, 188 F.3d at 662. Under this definition, it would appear that a purely lateral transfer or denial of the same, which by definition results in no decrease in title, pay or benefits, is not an adverse employment action for discrimination purposes. See Kocsis, 97 F.3d at 886, a conclusion consistent with the authority from our sister circuits. See, e.g., Williams v. R.H. Donnelley, Corp., 368 F.3d 123, 128 (2d Cir. 2004); O'Neal v. City of Chicago, 392 F.3d 909, 913 (7th Cir. 2004); Amro v. Boeing Co., 232 F.3d 790, 797-98 (10th Cir. 2000); LePique v. Hove, 217 F.3d 1012, 1014 (8th Cir. 2000); Brown v. Brody, 199 F.3d 446, 455-56 (D.C. Cir. 1999); Boone v. Goldin, 178 F.3d 253, 256 (4th Cir. 1999); Burger v. Cent. Apartment Mgmt., 168 F.3d 875, 879 (5th Cir. 1999); Doe v. Dekalb County Sch. Dist., 145 F.3d 1441, 1448 (11th Cir. 1998).[5]

Momah presents no evidence that he suffered a loss of pay, benefits, or title, or any alteration in his job responsibilities as a result of being denied a transfer to Detroit; instead he contends that the denial was adverse because it denied him the opportunity to be closer to his family. His argument raises the issue of whether the adversity of a given employment action should be judged based on an objective or

---

[5]Momah urges us to reject this uniform authority based on the First Circuit's remark in Randlett v. Shalala, 118 F.3d 857, 862 (1st Cir. 1997), refusing to "accept the ... view that a refusal to transfer is automatically outside Title VII." We decline to do so.

15

subjective standard. We have previously held that an "employee's subjective impressions as to the desirability of one position over another are not relevant" in determining whether the employee suffered an adverse employment action. Policastro v. Northwest Airlines, Inc., 297 F.3d 535, 539 (6th Cir. 2002); see also Strouss v. Mich. Dep't of Corr., 250 F.3d 336, 343 n.2 (6th Cir.2001) (explaining that "purely personal reasons for turning down a transfer are not sufficient to render a transfer an adverse employment action"); Reese v. State of Mich. Family Independence Agency, 31 Fed. Appx. 172, 174 (6th Cir. 2002) (relying on Strouss to hold that "purely personal reasons for requesting a transfer are not sufficient to render its denial an adverse employment action"). Instead, we employ an objective test that considers whether the employment action at issue was "objectively intolerable to a reasonable person." Policastro, 297 F.3d at 539 (citing Kocsis, 97 F.3d at 886); Strouss, 250 F.3d at 342; see also Keeton v. Flying J, Inc., 429 F.3d 259, 264-66 (6th Cir. 2005) (applying objective test to determine whether lateral geographic transfer constituted adverse employment action). Our circuit's focus on objective indicia of adversity is consistent with the holdings of our sister circuits that an employee's subjective preference for one position over another is insufficient to render the denial of a purely lateral transfer an adverse employment action under the discrimination provision of Title VII. See, e.g., O'Neal, 392 F.3d at 913 (holding that a "purely subjective preference for one position over another" does not "justify trundling out the heavy artillery of federal antidiscrimination law" in a Title VII claim for the denial of a lateral transfer where "the two jobs were equivalent other than in idiosyncratic terms") (quotation and citation ommited); Williams, 368 F.3d at 128 (rejecting employee's denial of transfer claim on grounds that employee's desire to return to Las Vegas where she still maintained a home was merely a "subjective, personal disappointment[]" insufficient to "meet the objective indicia of an adverse employment action"); Sanchez v. Denver Pub. Sch., 164 F.3d 527, 532-33 n.6 (10th Cir.1998) ("If a transfer is truly lateral and involves no significant changes in an employee's conditions of employment, the fact that the employee views the transfer

16

either positively or negatively does not of itself render the denial or receipt of the transfer [an] adverse employment action.").

Applying these principles to Momah's claim, we conclude that he has failed to produce evidence from which a jury could conclude that the denial of his request to be transferred to either an investigator or Administrative Judge position in the Detroit office would be adverse to a reasonable person. First, the record demonstrates that a transfer from Momah's position as an Administrative Judge in Memphis to the investigator position in Detroit would have constituted a demotion within the EEOC, which would lead a reasonable jury to conclude that Momah had suffered an adverse employment action if his request for a demotion had been granted. See, e.g., Williams, 368 F.3d at 128 ("Clearly, an employer's denial of a transfer request that would have resulted in a reduction in pay and the employee's demotion within the organization, without more, does not constitute an adverse employment action."). Second, Momah presents no evidence that the Administrative Judge position in Detroit differed in any way, save for proximity to his family, from the identical position he held as an Administrative Judge in Memphis, and thus fails to provide evidence from which a jury could conclude that the Memphis position was objectively worse than the identical position in Detroit. Because Momah has not shown that he suffered an adverse employment action, he fails to establish a prima facie case.[6]

---

[6]The Supreme Court's decision in White expanded the definition of an "adverse employment action" for claims brought pursuant to Title VII's anti-retaliation provision. Id. at 2415 (holding that Title VII's retaliation provision covers all retaliatory "employer actions that would have been materially adverse to a reasonable employee or job applicant," and stating that such actions are deemed "materially adverse" if they "could well dissuade a reasonable worker from making or supporting a charge of discrimination"). Because White was limited to the retaliation provision of Title VII, the Court's holding does not affect our foregoing discussion of adverse employment actions in the context of Momah's discrimination claim.

17

Momah argues that the district court "abused its discretion by completely ignoring all of [his] evidence in support of his retaliation claims." Title VII prohibits retaliation by an employer where an individual has engaged in protected activity. 42 U.S.C. § 2000e-3(a). A plaintiff can establish retaliation under Title VII without direct evidence under the burden-shifting approach set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). See, e.g., DiCarlo, 358 F.3d at 420. Under this standard, Momah must first establish a prima facie case of retaliation by showing that (1) he engaged in an activity protected by Title VII; (2) the defendant knew of the exercise of his rights; (3) the defendant took an employment action adverse to the plaintiff; and (4) there was a causal connection between the protected activity and the adverse employment action. Id. If Momah can establish a prima facie case, the burden of coming forward with a legitimate, non-discriminatory reason for the adverse employment action falls upon the EEOC. Id. (quotation omitted). However, if the EEOC articulates a non-discriminatory reason, it is then Momah's burden to show that the EEOC's reasons are merely a pretext for retaliation. Id.

Momah points to four actions allegedly undertaken by the EEOC to retaliate against him for filing an EEO complaint: (1) delaying one of his promotions; (2) refusing to process his subsequent EEO complaints; (3) negatively rating his performance; and (4) failing to grant his transfer requests. He fails to make out a prima facie case for any of these claims. With respect to the delay of promotion claim, Momah presents no evidence to rebut the EEOC's evidence that he received his promotion on the first day he became eligible, namely the one-year anniversary of his previous promotion. Regarding the EEOC's alleged failure to process his complaint, there is no separate cause of action for his claim, see, e.g., Jordan v. Summers, 205 F.3d 337, 342 (7th Cir. 2000) (holding plaintiff's claim that agency "botched the processing of her [EEO] complaint ... does not state a claim upon which relief can be granted"); rather, if Momah was dissatisfied with the agency's handling of a complaint his remedy was to do precisely what he did here: proceed to federal court. Id.

18

With regard to his third and fourth claims, even assuming, <u>arguendo</u>, that those actions constituted adverse employment actions under <u>White</u>, Momah is still unable to establish a prima facie case of retaliation. Specifically, Momah cannot establish the fourth element of the burden-shifting approach; there is no evidence of a causal connection between the protected activity and the adverse employment action. The EEOC rated Momah's performance as "proficient" as opposed to "outstanding" in November 1998. The EEOC denied Momah's initial request for reassignment as an Admistrative Judge on February 3, 1998. Momah then communicated his willingness to work in Detroit either as an Administrative Judge or as an investigator in August 1998, which was also unsuccessful. Momah, however, did not engage in protected activity until October 13, 1999. Although the performance ratings and the denials of transfer continued to occur after this date, Momah makes no distinction between the conduct of his employer before October 1999 and the allegedly retaliatory conduct. We therefore conclude that no causal nexus exists between the employer conduct and the protected activity, and Momah's final two claims must fail as well. <u>See</u> <u>Walborn v. Erie County Care Facility</u>, 150 F.3d 584, 589 (6th Cir. 1998) (holding that a plaintiff who complained of numerous allegedly adverse actions that occurred both before and after her protected activity could not establish the causal connection element because she had not alleged that her employer "treated her differently since she asserted her rights" and that "[t]he fact that some of the allegedly retaliatory actions took place after [she] filed an EEOC charge is insufficient to establish the requisite causal connection").

The judgment of the district court is AFFIRMED.