**NOT RECOMMENDED FOR PUBLICATION**
File Name: 13a0156n.06

**No. 11-3457**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**
*Feb 12, 2013*
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| WESLEY FULLEN, | ) | |
| | ) | |
| Plaintiff-Appellant, | ) | |
| | ) | |
| v. | ) | ON APPEAL FROM THE UNITED |
| | ) | STATES DISTRICT COURT FOR |
| CITY OF COLUMBUS, | ) | THE SOUTHERN DISTRICT OF |
| | ) | OHIO |
| Defendant-Appellee. | ) | |
| | ) | |

Before: SILER and WHITE, Circuit Judges; REEVES, District Judge.[*]

**SILER**, Circuit Judge. Plaintiff Wesley Fullen appeals from the district court's grant of summary judgment to Defendant City of Columbus on Title VII and Ohio Civil Rights Act (OCRA) claims of race discrimination and hostile work environment and 42 U.S.C. § 1983 claims of retaliation and equal protection. We **AFFIRM** the district court's judgment.

**I.**

Fullen, an African-American man, serves as an officer in the City of Columbus Division of Fire (CDF). From 1997 to 2004, Fullen served in various leadership capacities in the Fire Prevention Bureau (FPB). In 2004, Fullen reached the rank of Battalion Chief and was awarded a leadership position in the Fire Alarm Office.

---

[*] The Honorable Danny C. Reeves, United States District Judge for the Eastern District of Kentucky, sitting by designation.

The same year, the first of three investigations began into allegations of criminal and civil misconduct in the FPB. Fullen was not interviewed for the first two. In 2005, the City announced its intention to conduct a third investigation, and newspapers published negative articles about the FPB. The City and the union reached an oral agreement that a union representative would be present for the interviews, although a person under investigation had the right to refuse union representation. The union requested that the investigator record all interviews, but several of the interviews with Caucasian officers were not recorded. A union representative attended some, but not all, of the interviews.

In 2006, Fullen appeared for his interview. A union representative also appeared, and Fullen objected, stating that he would go forward and cooperate, but that he did not wish to have union representation. The investigator insisted that the interview go forward with the union representative present, but not personally representing Fullen; however, Fullen persisted with his objection. The CDF Chief at least twice verbally ordered Fullen to be interviewed with the union representative present. He refused the direct orders.

Fullen faced charges of insubordination based on his refusal to obey the orders. After a hearing, the Chief recommended Fullen's termination, which the Director of Public Safety upheld after an additional hearing. On further appeal, the Columbus Civil Service Commission reduced the termination decision to a six-month suspension without pay. Upon his return, Fullen received temporary 40-hour assignments, then served as an unassigned battalion chief on 48-hour assignment. He was denied transfer requests to return to the Fire Alarm Office and the FPB.

In 2008, Fullen filed suit against the City, alleging to have witnessed and suffered discrimination, a hostile work environment, and unlawful suppression of free speech. The district court granted summary judgment to the City, finding that Fullen failed to establish a prima facie case of race discrimination and show any hostile actions based on race or retaliation. The court also held that Fullen's argument of hostile work environment based on retaliation was so underdeveloped as to be waived. Fullen's Section 1983 First Amendment retaliation claim failed, according to the district court, because the City cannot be held liable for the conduct of its employees or agents. The court found Fullen's Section 1983 equal protection claim to be waived. The district court dismissed the remaining state-law tort claim without prejudice.

## II.

We review *de novo* a district court's grant of summary judgment. *Keck v. Graham Hotel Sys., Inc.,* 566 F.3d 634, 636 (6th Cir. 2009).

### A.  Title VII and OCRA Race Discrimination Claims

Under Title VII, an employer may not "discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin."  42 U.S.C. § 2000e-2(a)(1) (2006).  Similarly, under the OCRA, an employer may not "discharge without just cause, . . . refuse to hire, or otherwise discriminate against [individuals in protected classes] with respect to hire, tenure, terms, conditions, or privileges of employment, or any matter directly or indirectly related to employment." 42 Ohio Rev. Code § 4112.02.  Courts generally apply the same analysis to discrimination claims under Title VII and the OCRA.  *Staunch v. Cont'l Airlines, Inc.,* 511 F.3d 625, 631 (6th Cir. 2008); *Plumbers*

*& Steamfitters Joint Apprenticeship Comm. v. Ohio Civil Rights Comm'n,* 421 N.E.2d 128, 131 (Ohio 1981).

Because Fullen does not pursue a direct-evidence theory of race discrimination, we apply the familiar burden-shifting framework for circumstantial evidence under *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Under this framework, the plaintiff must first make out a prima facie case of race discrimination, after which the burden shifts to the employer to proffer a legitimate, nondiscriminatory reason for its decision. *Upshaw v. Ford Motor Co.,* 576 F.3d 576, 584 (6th Cir. 2009). If the employer carries its burden, the plaintiff must prove by a preponderance of the evidence that the reasons offered by the employer were pretextual. *Id.*

Fullen establishes a prima facie case of race discrimination, by showing that: "1) he is a member of a protected class; 2) [he] was qualified for the job; 3) he suffered an adverse employment decision; and 4) [he] was replaced by a person outside the protected class or treated differently than similarly situated non-protected employees." *Newman v. Fed. Express Corp.*, 266 F.3d 401, 406 (6th Cir. 2001). The parties only dispute the third and fourth elements.

As to the third element, an adverse employment action is one that results in a materially adverse change in the terms and conditions of the plaintiff's employment. *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 760-62 (1998). Fullen establishes several adverse employment actions including termination (later reduced to a 6-month suspension) and a resulting loss in base compensation, and denial of transfer requests to the FPB. Fullen's termination constitutes an adverse employment action, notwithstanding that it was reduced to a suspension. *See Randolph v. Ohio Dep't of Youth Servs.*, 453 F.3d 724, 736-37 (6th Cir. 2006). Denials of transfer may be materially

adverse where a loss of pay or benefits or an alteration of responsibilities stands at issue. *Momah v. Dominguez*, 239 F. App'x 114, 123 (6th Cir. 2007).

Fullen also sufficiently establishes the similarly situated element of his prima facie case. To demonstrate that he is "similarly-situated" to another employee, he need not show an exact correlation with the employee receiving more favorable treatment. *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 352 (6th Cir. 1998). The plaintiff and the employees with whom the plaintiff seeks to compare himself or herself must be similar in "all of the relevant aspects." *Pierce v. Commonwealth Life Ins. Co.*, 40 F.3d 796, 802 (6th Cir. 1994). Fullen argued comparatives to Captain Devlin, a Caucasian officer who occupied a battalion chief position in FPB that Fullen sought by transfer, and Battalion Chief Cannell and Captain Vedra, Caucasian officers who allegedly were granted transfers to the FPB even though they also had insubordination in their records. Battalion Chief Cannell also offers an appropriate comparative as to the denials of transfer requests, but Captain Vedra does not. Fullen tendered evidence establishing both Cannell and Vedra as Caucasian officers who had insubordination in their records, but still ended up successfully transferring to desired positions. However, the charge against Vedra was dismissed after a successful grievance. Of the three, only Fullen, the only African-American officer, saw his transfer applications denied. Moreover, Captain (now Battalion Chief) Devlin does not serve as an appropriate comparative. Most notably, Fullen himself occupied the battalion chief position in FPB when he was only a captain and, on the basis of his work, ended up earning a promotion. Similarly, Devlin, a Caucasian, occupied that position and ended up earning a promotion. Finally, Fullen also contended a comparative with Captain Davis, a Caucasian officer who refused a direct order, but

never faced insubordination charges. Captain Davis offers an appropriate comparative as to termination and suspension. Both men served as officers when they chose to disobey an order, and both men disobeyed a direct order from CDF leadership. However, Davis received only a memorandum of understanding for his insubordination.

In response to Fullen's prima facie case, the City of Columbus met its burden to articulate a legitimate, nondiscriminatory reason for the adverse employment action: insubordination. We have repeatedly held that insubordination may constitute a legitimate, nondiscriminatory reason for adverse action. *See, e.g., Russell*, 537 F.3d at 604 (employee refused to obey doctor's directive to remove sutures and administer medication intravenously); *Hibbler v. Reg'l Med. Ctr. at Memphis*, 12 F. App'x 336, 340 (6th Cir. 2001) (employee refused supervisor's directive to turn off tape recorder). Fullen contends that he believed the written and verbal orders from the Chief to be "illegal" and, thus, not necessary to be obeyed. However, he provided no legal authority supporting such a premise for rejecting an employer's proffered reason for adverse action where no life stood at risk.

Fullen fails to prove the City's reason to be pretextual sufficiently to defeat summary judgment and merit a jury trial. A plaintiff may show pretext in three ways: "'(1) that the proffered reason[] had no basis in fact, (2) that the proffered reason[] did not actually motivate the employer's action, or (3) that [the reason was] insufficient to motivate the employer's action.'" *Romans v. Mich. Dep't of Human Servs.*, 668 F.3d 826, 839 (6th Cir. 2012) (quoting *Chen v. Dow Chem. Co.*, 580 F.3d 394, 400 (6th Cir.2009)). Here, the City demonstrated the CDF to be a duty-bound organization wherein following orders has particular importance. While Fullen appears to have received

particularly harsh punishment for his insubordination, he directly disobeyed the Chief, even after the Chief confronted him and made clear that Fullen's conduct, if continued, would constitute insubordination. The City reasonably considered the severity of the insubordination in making decisions regarding Fullen, and in sufficient evidence suggests any racial or retaliatory animus.

### B. Title VII and OCRA Hostile Work Environment Claims

Fullen contends that the district court erroneously granted summary judgment to the City on his federal and state hostile work environment claims, and these claims come close to surviving summary judgment. However, Fullen ultimately fails to establish the necessary genuine disputes of material fact.

To establish a prima facie case of a hostile work environment based on race, a plaintiff must demonstrate that: (1) he is a member of a protected class; (2) he was subjected to unwelcome harassment; (3) the harassment was based on plaintiff's protected status; (4) the harassment was sufficiently severe or pervasive to affect a term, condition, or privilege of employment; and (5) the employer knew or should have known about the harassing conduct but failed to take corrective or preventative actions. *Bailey*, 526 F.3d at 885; *Clay*, 501 F.3d at 706. In deciding whether actionable harassment exists, we consider the totality of the circumstances, including the frequency of the alleged discriminatory conduct, its severity, whether the conduct is physically threatening or humiliating or a mere offensive utterance, and whether the conduct unreasonably interferes with the employee's work performance. *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 115-16 (2002). We evaluate Title VII and OCRA hostile-work-environment claims under the same evidentiary standards. *Simoudis v. Ford Motor Co.*, 29 F. App'x 314, 316 (6th Cir. 2002).

First, Fullen presented sufficient evidence to raise a genuine dispute of material fact as to whether he was the victim of unwelcome race-based harassment. Fullen documents denial of his transfer requests to 40-hour positions, ultimately left vacant or filled by Caucasians, as well as the denial of remote parking privileges to some African-Americans. The Assistant Chief assigned to the FPB permitted Caucasian FPB officers and firefighters to report directly to him in violation of the chain of command. A CDF firefighter referenced lynching on the local union blog. Fullen witnessed a Caucasian captain standing in a window to document late-arriving African-American firefighters, while never documenting Caucasian firefighters also arriving late. Fullen was met with laughter when he questioned the captain on this practice. Fullen was prohibited from attending some leadership meetings, and African-American officers were purposely assigned to pick up mail from the remote fire stations. Nothing in the record suggests that the officers sought out such assignments. Fullen suffered a hostile reaction from Caucasian senior officers when he wrote a newsletter column for Columbus African-American Firefighters Association (CAAFA), but a Caucasian firefighter who wrote an editorial column for a newspaper opposing affirmative action received no like reaction. After putting up an African-American-themed Christmas tree as part of a CDF Christmas tree display, Fullen received an interdivisional (within-the-building) phone call where an anonymous co-worker made offensive, racially-charged remarks. Fullen learned secondhand about Caucasian officers, including a battalion chief and an assistant chief, and firefighters also using racial slurs. Fullen had for years known about an underground newsletter called *The Worm* that circulated through CDF stations and made "racially and sexually insensitive remarks . . ., either specifically

aimed at people such as [Fullen] and [his wife] at one point, or just black people in general or women in general." The deputy chief told Fullen that the mayor wanted his "black ass fired."

Fullen further created a genuine dispute of material fact as to whether the harassment occurred based on his protected status. The record reflects several racially inflammatory remarks including reported racial slurs by CDF officers. Fullen's reported observation of a Captain who wrote up late-arriving African-American firefighters, but not late-arriving Caucasian firefighters reflects an open hostility based on race. That incident parallels Fullen's experience with a Caucasian officer who sought to write up an African-American firefighter for a questionable uniform violation while ignoring numerous repeated uniform violations by Caucasian firefighters. Fullen also presented evidence that the FPB, and especially the inspections section, had long been a largely African-American unit within the CDF, and he attempted to suggest any actions against the FPB had a discriminatory animus. However, administrative decisions affecting a largely African-American group do not automatically evince a discriminatory animus.

Fullen has also created a genuine dispute of material fact concerning his employer's knowledge and actions. Many of the alleged incidents involve CDF officers, rather than firefighters, and many of the CDF officers possessed the ability to take action. CDF leadership, and even Department of Public Safety leadership, received multiple reports of race-based and race-related harassment occurring in the FPB, including the many allegations made in this and other parallel cases. Fullen made his race-based and race-related concerns evident at a press conference conducted by CAAFA, as well as before the City Council. The Director of Public Safety attended that City Council meeting and spoke on the record. The Chief received a report about the City Council

appearance. Fullen reported his concern about *The Worm*. He directly confronted the Caucasian officer targeting late-arriving African-American firefighters with disciplinary infractions. However, little, if any, credibly proportionate action appears in the record. The Department of Public Safety laid off its only two EEO officers, determining that they were no longer necessary once a federal court order had no longer required the position/s. The Chief requested an investigation into workplace hostility by the Police Internal Affairs Bureau, but that inquiry ended up limited to Battalion Chief Arnold's complaints and conducted by an outside investigator. The City EEOC officer who normally investigated EEO complaints had been out of the office for an extended period of time, and a concern had been raised about the ability of the Internal Affairs Bureau to examine EEO issues. The Chief himself acknowledged circulation of *The Worm* and affirmed that no investigation has been conducted into the source of the newsletter. He indicated that, while he has not seen any subsequent issues of *The Worm*, others could have.

Fullen failed to establish a genuine dispute of material fact concerning the severity and pervasiveness of the actions. Fullen must have experienced, witnessed, or known about the events for them to support his hostile-work-environment claim. *See Berryman v. SuperValu Holdings, Inc.*, 669 F.3d 714, 719 (6th Cir. 2012). While the anonymous telephone call and reported racially charged remarks by CDF leaders are disturbing and reprehensible, they appear to be isolated and thus do not rise to the level of pervasiveness necessary. *See id.* at 716-17 (sporadic racist comments, racially motivated pranks, and vulgar graffiti by coworkers were insufficiently severe or pervasive to create an objectively hostile or abusive work environment); *Williams v. CSX Transp. Co., Inc.*, 643 F.3d 503, 513 (6th Cir. 2011) (a supervisor's racially offensive statements were isolated and thus

not sufficiently pervasive where all but two occurred over a two-day period, nor were the statements sufficiently severe because they resembled "mere offensive utterances" rather than conduct that is physically threatening or humiliating, to constitute a hostile work environment).  Likewise, the isolated incidents of alleged disparity between the discipline of African-American and Caucasian employees were not sufficiently pervasive. *See Berryman*, 669 F.3d at 720, 722 (summary judgment against plaintiff's hostile work environment claim was proper even over dissent specifically identifying alleged disparities in discipline). *But see id.* at 722 (Stranch, J., dissenting).  While *The Worm* may have been continuously published, Fullen only points to a few instances where he knew of its offensive content. *See id.* at 716-17 (sporadic racial graffiti and racist remarks by coworkers did not constitute a hostile work environment); *Ross v. Kansas City Power & Light Co.*, 293 F.3d 1041, 1050 (8th Cir. 2002) (allegations of racial jokes and cartoons in letters and racist literature circulated around an office, due to lack of evidence in the record, did not constitute a hostile work environment)*; Smith v. Leggett Wire Co.,* 220 F.3d 752, 760 (6th Cir. 2000) (coworkers and supervisors regularly making racially discriminatory comments and racially motivated threats and the circulation of a racially charged cartoon did not constitute a hostile work environment).  No reasonable jury could conclude that Fullen experienced harassment that was "sufficiently severe or pervasive to alter the conditions of [his] employment and create an abusive working environment." *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 67 (1986) (internal quotation marks and citation omitted).

<u>C.  42 U.S.C. § 1983 Retaliation for Free Speech and Equal Protection Claims</u>

Fullen contends that the district court erred in granting summary judgment to the City on both Section 1983 theories. He takes particular issue with the brevity of the district court's analysis, though he acknowledges that court incorporated analysis from another opinion and order.

Section 1983 provides a cause of action for "the deprivation of any rights, privileges, or immunities secured by the Constitution and laws" by any person acting "under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory." 42 U.S.C. § 1983. Under this statute, "a local government may not be sued . . . for an injury inflicted solely by its employees or agents. Instead, it is when execution of a government's policy or custom . . . inflicts the injury that the government as an entity is responsible . . . ." *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978). Governmental policy or custom is in turn determined by "lawmakers or by those whose edicts or acts may fairly be said to represent official policy." *Id.*

As to free speech, Fullen seeks to associate City policy with an unspoken allegedly negative reaction by CDF leadership to his participation in a CAAFA press conference criticizing the investigations. However, no Supreme Court or Sixth Circuit decision has applied the *Monell* language to an alleged unspoken concern by an employer about the exercise of First Amendment rights where no connection has been shown to the adverse action in question. *Compare Meyers v. City of Cincinnati*, 14 F.3d 1115, 1118-19 (6th Cir. 1994) (affirming a Section 1983 judgment against the City of Cincinnati, where an assistant fire chief retired, rather than be demoted and lose benefits, after City's "highest officials" found his investigation of distribution of affirmative action materials to have included questions and statements critical of affirmative action); *Burkhart v. Randles*, 764 F.2d 1196, 1202-03 (6th Cir. 1985) (reversed and remanded for retrial where court

clerk allegedly terminated employees who did not support her in an election and refused to "voluntarily" contribute a portion of their salary to the campaign). Fullen has not shown a link between his participation in the CAAFA press conference and an adverse action, so he cannot establish that he was deprived of a First Amendment right based on governmental policy.

As a matter purportedly beyond *Monell*, Fullen also contends specific orders not to congregate or discuss their complaints or discrimination and retaliation evidenced First Amendment retaliation. However, Fullen raised no First Amendment freedom of association claim at all, much less related to the desired congregation, and no court has ever recognized a First Amendment right to discuss complaints informally among co-workers, where none of the co-workers has any involvement with EEO, on company time in the workplace.

Fullen also contends that the City's selective enforcement of lawful policies violates his equal protection rights. A plaintiff seeking to establish such a violation must show that "the selective treatment was motivated by an intention to discriminate on the basis of impermissible considerations, such as race or religion, to punish or inhibit the exercise of constitutional rights, or by a malicious or bad faith intent to injure the person." *Wright v. MetroHealth Med. Ctr.*, 58 F.3d 1130, 1137 n.7 (6th Cir. 1995) (quoting *FSK Drug Corp. v. Perales*, 960 F.2d 6, 10 (2d Cir. 1992)). For the same reasons that Fullen could not demonstrate the City's employment decisions to be pretextual, here he has not shown a discriminatory purpose. The City established the CDF to be a duty-bound organization wherein following orders has particular importance, and Fullen chose to directly disobey the Chief, even when advised that his actions would constitute insubordination. Fullen has

not shown the resulting termination/suspension and denials of transfer were motivated by impermissible considerations.

### D.  Jurisdiction over Remaining State-Law Tort Claim

Fullen contends that the district court should have retained jurisdiction over his remaining state law tort claim and denied summary judgment to the City of Columbus on that claim.  We review a district court's decision declining to exercise supplemental jurisdiction to hear a plaintiff's state-law claim under the abuse-of-discretion standard.  *Gamel v. City of Cincinnati*, 625 F.3d 949, 951 (6th Cir. 2010). After summary judgment, only a state-law tort action remained, and while discovery had been completed, the parties had not engaged in pretrial filings or participated in any trial-focused pretrial conferences.  The district court need not have decided a wholly state-law issue better reserved for the state courts, and its decision to dismiss without prejudice does not constitute an abuse of discretion.

**III.**

For the reasons described, we **AFFIRM**  the judgment of the district court.

No. 11-3457
*Fullen v. City of Columbus*

**HELENE N. WHITE, Circuit Judge,** concurring in part and dissenting in part. I join the majority in affirming the dismissal of Fullen's claims with the exception of the race-based hostile work-environment claims. I agree with the majority's analyses and determinations regarding whether Fullen established the prima facie elements of a race-based hostile-work environment claim except as to the "sufficiently severe or pervasive" prima facie element.

The numerous incidents of race-based conduct Fullen experienced or witnessed are set forth in Part II.B. of the majority opinion. I conclude that a jury viewing these incidents in their totality could find that race-based harassment at the CDF was "ongoing, commonplace, and continuing," *Berryman v. SuperValu Holdings, Inc.*, 669 F.3d 714, 717 (6th Cir. 2012) (internal quotations and citations omitted); that is, severe or pervasive enough to alter the conditions of Fullen's employment. *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993); *Hawkins v. Anheuser-Busch Inc.*, 517 F.3d 321, 332–33 (6th Cir. 2008); *Gallagher v. C.H. Robinson Worldwide, Inc.*, 567 F.3d 263, 273 (6th Cir. 2009) (although individual instances of harassment do not on their own create a hostile environment, the accumulated effect of such incidents may result in a Title VII violation). When viewed in a light most favorable to Fullen, the record evidences a work environment permeated with race-based disparate treatment and harassment, and ongoing complaints of racial harassment. These complaints included Fullen's request for an investigation of the racially hostile newsletter, *The Worm*–a request that fell on deaf ears.[1] A jury could conclude that the unchallenged and unrebuked publication and

---

[1] *Compare Allen v. Nat'l R.R. Passenger Corp.*, 228 F. App'x 144, 147 (3d Cir. 2007) (finding a single incident of racist flyers was insufficient to establish a prima facie hostile-work-environment case where the employer "swiftly removed the flyers, filed an incident report with the police, and held an all-employee meeting to explain that the incident was unacceptable and

dissemination of *The Worm* across fire stations throughout Fullen's CDF career evidenced a culture

tolerant of racially harassing conduct.

For these reasons, I would reverse the grant of summary judgment on Fullen's race-based

hostile work environment claims.

---

under investigation"), *with Austin v. Minn. Mining & Mfg. Co.*, 193 F.3d 992, 994 (8th Cir. 1999) (concluding that the plaintiff failed to establish that a single derogatory flyer affected a condition of her employment and that she failed to rebut the defendants' proof that they "promptly removed the flyer and investigated").