RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

File Name: 12a0046p.06

# UNITED STATES COURT OF APPEALS

FOR THE SIXTH CIRCUIT
_____

JERRY ROMANS,

        *Plaintiff-Appellant,*

     *v.*

MICHIGAN DEPARTMENT OF HUMAN
SERVICES,

        *Defendant-Appellee.*

No. 10-2174

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 08-13125—John Feikens, District Judge.

Argued: January 18, 2012

Decided and Filed: February 16, 2012

Before: SUHRHEINRICH, GIBBONS, and McKEAGUE, Circuit Judges.

_____

## COUNSEL

**ARGUED:** Liisa R. Speaker, SPEAKER LAW FIRM, PLLC, Lansing, Michigan, for Appellant. Jeanmarie Miller, OFFICE OF THE MICHIGAN ATTORNEY GENERAL, Lansing, Michigan, for Appellee. **ON BRIEF:** Liisa R. Speaker, SPEAKER LAW FIRM, PLLC, Lansing, Michigan, for Appellant. Jeanmarie Miller, OFFICE OF THE MICHIGAN ATTORNEY GENERAL, Lansing, Michigan, for Appellee.

_____

## OPINION

_____

McKEAGUE, Circuit Judge. Plaintiff Jerry Romans, a Caucasian male, alleges that Defendant Michigan Department of Human Services violated Title VII by discriminating against him based on his race. Plaintiff further alleges that Defendant violated the Family and Medical Leave Act ("FMLA") by interfering with his FMLA-

1

leave rights and retaliating against him for his exercise of FMLA-protected rights. The district court granted summary judgment to Defendant as to both Plaintiff's Title VII and FMLA claims. Plaintiff appeals. For the reasons that follow, we affirm the district court's decision to grant summary judgment with regard to Plaintiff's Title VII claims, but vacate and remand for further proceedings with regard to Plaintiff's FMLA claims.

## I. BACKGROUND

Plaintiff began working for Defendant as a Fire and Safety Officer at the W.J. Maxey Training School for Boys ("Maxey") in Whitmore Lake, Michigan on May 15, 2000. He was supervised by Assistant Chief Walter Easley and Chief of Security Terry Blackburn. Maxey houses juveniles in the State's custody for delinquency. Fire and Safety Officers provide security for the facility and are subject to numerous work rules. Among other assignments, at the time Plaintiff worked at Maxey, Fire and Safety Officers could be assigned to the Control Center #1 post ("CC1") or the Control Center #2 post ("CC2"). As their names imply, CC1 was the primary post responsible for monitoring the closed-circuit television cameras and operating the access system that opens locked doors throughout the facility, whereas CC2 acted as a back-up to CC1. A CC1 officer could not leave his position unless relieved.

Plaintiff was a member of the Michigan State Employees Association Union and could only be terminated for cause. Maxey's employment policies provide for employer intervention at four different levels: informal counseling, formal counseling, reprimand, and suspension. Pursuant to the Union Contract, neither formal nor informal counseling is considered a disciplinary action or a precursor to a disciplinary action. Formal counselings and disciplinary actions, i.e., reprimands or suspensions, become stale and must be removed from an employee's record after twelve months unless the employee has engaged in subsequent, similar conduct within that time period.

Historically, the Michigan Department of Corrections engaged in an affirmative-action hiring process. *See Crawford v. Dept. of Civil Serv.*, 645 N.W.2d 6, 7–8 (Mich. 2002). This hiring process treated racial minorities, women, and handicapped persons as though they scored higher on performance examinations than they actually did and

has been abandoned by the department. *Id.* Plaintiff has presented evidence that Maxey used to have a policy of hiring eighty percent African Americans in order to mirror the racial composition of the facility's juvenile population.

## A. Adverse Employment Actions Against Plaintiff

A timeline of employment actions taken against Plaintiff, construed in the light most favorable to Plaintiff as the non-moving party, is as follows:

*May 11, 2005 Suspension (one day)***:** Plaintiff was suspended after a timely investigation that substantiated a social worker's allegations that he had made derogatory and sexually inappropriate comments to youths housed at the facility. The investigation substantiated claims that Plaintiff directed the words "bitch" and "slut" towards male youth, referred to a youth as "Tito," asked if he had been to the Neverland Ranch, and referred to the television show *Fear Factor* as "queer factor." Plaintiff claims that foul language was fairly commonplace among Maxey employees.

*2006 Formal Counselings***:** Plaintiff received three formal counselings in 2006: one for failing to report for scheduled overtime, another for failure to timely report an absence, and another for failure to remain alert to job duties and work cooperatively. It bears repeating that, pursuant to the union contract, such formal counseling and informal counseling were not to be considered disciplinary actions.

*May 15, 2007 Suspension (one day)***:** Plaintiff was suspended for "leaving the facility and abandoning [his] shift." Plaintiff states that he was working a 3 p.m. to 11 p.m. shift on April 4, 2006 when he received a call from his sister, who told him that his mother—who suffered from lung cancer and renal failure—was unlikely to survive the night, and decisions needed to be made about her care including whether to keep her on life support. Prior to this incident, Plaintiff had submitted Department of Human Services paperwork certifying that he was a health care provider and power of attorney for his mother and had acquired permission to use a cell phone while at work so that he could be alerted of emergencies. Plaintiff intended to go to the hospital immediately after his shift, which was scheduled to end at 11 p.m. However, at 10:30 p.m. a night

shift employee called in sick, and Plaintiff was told that he had to stay on for a double shift.[1] Plaintiff states that he had found another coworker to cover the additional shift, but that his supervisor, Walter Easley, told him that the rules would not allow the proposed switch. Plaintiff claims that he told Easley "I'm not staying. My mom's dying. I'm leaving," but that Easley responded "I'll have you fired if you leave." Plaintiff says that at that point he punched out, left the facility, and drove to the nearby University of Michigan Hospital. However, Plaintiff states that he became worried he would lose his job and did not know what to do, so he turned around to go back to work as soon as he got to the hospital and returned to his shift. Eventually, Chief Blackburn allowed Plaintiff to leave later in the course of his extra shift.

*June 26, 2007 Suspension (three days)***:** Plaintiff was suspended after he admitted to calling his then-friend and coworker Tyrone Perteet a "motherfucker" twice over the facility's intercom system. Although Perteet was not offended by the language, another worker in the control room heard the cursing and was offended. Perteet was encouraged to document the incident as well, an action that Defendant claims led to subsequent problems between Plaintiff and Perteet.

*February 28, 2008 Suspension (five days)***:** Plaintiff was suspended for failing to follow an order. The background on this suspension began on September 1, 2007, when Plaintiff witnessed Perteet enter a single-stall bathroom with a female employee over the cameras from his CC1 post. Plaintiff claims that he was concerned about the female employee and, after having his CC2 officer relieve him, went to check on them. The female employee said that she was there of her own free will. Plaintiff filed an incident report about that event, and Perteet received an adverse employment action as a result.

Then, in December 2007, another officer filed an unusual incident report ("UIR") accusing Plaintiff of using the facility's security cameras to watch Perteet while he

---

[1]Defendant has asserted that Safety Officers must be on duty at all times at Maxey. When there is a coverage issue, Maxey's policy is to first solicit volunteers for the extra shift, then to refer to the "mandation list" that keeps track of whose turn it is to serve a mandated shift in another officer's absence.

worked, allegedly for the purpose of catching Perteet violating a work rule and filing workplace complaints against him. The UIR also stated that Plaintiff said he "wished they would hurry up and fire him, so he can sue the hell out of their ass." Plaintiff states that, on February 8, 2008, he was working as the CC1 when Easley walked in and noticed that one of the security cameras was directed toward Maxey's front security counter where Perteet was stationed. Easley asked Plaintiff to move the camera. Plaintiff claims that before he could actually change the camera, Easley told him to go home instead. While exiting Plaintiff called Easley a racist. On February 21, 2008, Plaintiff received a five-day suspension resulting from this incident.

***March 2008 Formal Counseling and April 2008 Written Reprimand***: Plaintiff received three formal counselings for alleged misuse of the internal workplace complaint system. Between September 2007 and April 2008, Plaintiff filed a series of UIRs against Perteet, other coworkers, and his supervisors. Among them were the following: Plaintiff alleged that Perteet had threatened him on several occasions, and on one occasion followed Plaintiff in his car flashing his lights. Plaintiff also filed a report with the state police regarding the latter incident. Another UIR alleged that Plaintiff had heard Perteet and Easley discussing a female employee in a derogatory manner. In addition, Plaintiff encouraged two female employees to file complaints of sexual harassment against Perteet. Later, Plaintiff filed a UIR against Easley on the basis that Easley had not sufficiently investigated Plaintiff's grievances.

Plaintiff was issued two formal counselings and a written reprimand for failing to follow appropriate procedures for the UIRs because, contrary to Maxey protocol, he had not alerted anyone to the problems during his shifts before filing UIRs. In the counseling reports, Easley expressed concern that Plaintiff was using UIRs to disrupt the workplace in violation of a work rule that requires cooperation with coworkers.

**B. Perteet's Harassment Complaint and Ensuing Investigation**

On September 11, 2007, Perteet filed a Confidential Discriminatory Harassment Report with the Michigan Department of Human Services in which he claimed that Plaintiff was harassing him, threatening harm, and watching him on the security cameras. Perteet filed subsequent reports on December 3, 2007 and March 18, 2008. In the section for completion by administration, Maxey Director Hitchcock's signature appears, directing that the form be forwarded to the Equal Opportunity and Diversity Program Office. This occurred despite the fact that Perteet stated his claim of harassment was not intended to be a race-based claim.

The investigation that ensued was headed by Discriminatory Harassment Investigator Mary Hall-Thiam. Hall-Thiam investigated Perteet's charges of harassment, and her investigation substantiated several claims through witness interviews. The witnesses interviewed included Perteet, Chief Blackburn, and both women who had filed sexual harassment claims. The Hall-Thiam report substantiated that Plaintiff verbally assaulted or cursed out Perteet, based on the June 2007 intercom incident that formed the basis of Plaintiff's three-day suspension. Hall-Thiam also substantiated claims that Plaintiff filed false reports against Perteet to the Michigan State Police, stating that this may have been racially motivated. Hall-Thiam stated that the reason she thought Plaintiff's harassment may have been racially motivated was because of race relations in the historical context of the United States and in the particular Michigan county involved. Hall-Thiam's investigation further substantiated Perteet's allegation that Plaintiff encouraged female employees to file sexual harassment complaints against him—a claim that Hall-Thiam also stated "may have been racially motivated or done with intent by [Plaintiff] to raise racial tensions in reference to interracial relationships." Finally, the report substantiated Perteet's claims that Plaintiff followed him on the cameras, but Perteet's allegations that Plaintiff threatened him physically were not substantiated. Plaintiff points out that Hall-Thiam's supervisor, James Newsom, stated it would be improper to consider a claim substantiated simply because of a person's race and the history of the county in which the alleged acts took place.

**C. Plaintiff's EEOC Charge of Discrimination**

On November 20, 2007, Plaintiff presented a "Charge of Discrimination" form to the Federal Equal Employment Opportunity Commission through the Michigan Department of Civil Rights. In his complaint, Plaintiff stated that he had been racially harassed and that he was disciplined for cursing whereas other officers were not. Plaintiff described much of the harassment he allegedly experienced at the hands of Perteet, claiming that Maxey's Human Resources Department had refused to help him. Plaintiff also claimed that he feared being fired because of the investigation being conducted by Hall-Thiam. In support of this complaint, Plaintiff submitted two statements from female officers who he claims approached him complaining of sexual harassment by Perteet. Plaintiff concluded by saying that he was being harassed because of his race and in retaliation for the sexual harassment complaints he had helped to file.

Plaintiff's charge was forwarded from the Michigan Department of Civil Rights to the United States Equal Employment Opportunity Commission ("EEOC") on or about November 29, 2007. On May 6, 2008 the EEOC issued a "Right to Sue" letter stating that, because it could not investigate his charge in a timely manner, Plaintiff had a right to sue within 90 days, marking the inception of the present case. Notably, the face of this complaint does not indicate that a copy was sent to anyone at Maxey.

**D. Office of Labor Relations Investigation**

Hall-Thiam's findings regarding Perteet's allegations against Plaintiff were forwarded on to Paul Dean, the labor relations representative at the Department of Human Services Office of Labor Relations. Dean subsequently directed Easley and Blackburn to conduct a second investigation. Dean stated that the department would not discipline Plaintiff based on the Hall-Thiam Report. Dean then ordered a separate investigation and prepared a list of questions for Chief Blackburn to ask regarding: (a) "Encouraging female staff to file harassment complaints"; (b) "Using the cameras to

watch officer Perteet"; and (c) "Making threats to take down officer Perteet, Chief [Blackburn], and Walt."

Easley's investigation relied upon witness statements from Officers Clarence Seigle, James Reid, Gerald Gross, and Perteet; Chief Blackburn; Recreation Supervisor Denise Thomas; and Health Service Employee Melinda King. Those witnesses substantiated claims that Plaintiff had watched Perteet on the cameras, filed numerous UIRs although he was warned that this practice amounted to harassment, threatened to get other workers fired, and threatened Perteet that he was "going down."

**E. Summary of Investigation and Plaintiff's Termination**

A document entitled "Summary of Investigation" presents the findings of the second investigation and the reasons Defendant claims Plaintiff was terminated. Under "Conclusions" the Summary of Investigation states that Plaintiff violated four work rules: Work Rule 11, "failure to work cooperatively and treat others with courtesy and respect"; Work Rule 16, "threatened attempted or actual workplace violence"; Work Rule 20, "discriminatory harassment of coworkers"; and Work Rule 33, "conduct unbecoming a state employee." The Summary of investigation treats the violation of these four separate work rules as the basis for one discipline.

Under a section called "Additional Considerations," the Summary of Investigation states that "while a violation of any of these work rules could support a dismissal with his disciplinary history, the employer also is under the guidelines set out by the office of state employer. It has been determined that employees with five active disciplines should be dismissed from state service. Not counting the formal counselings on record for Officer Romans, he has five active disciplines on record. This discipline would be number six." That section goes on to list all of the above-mentioned adverse employment actions, including formal counselings that are not to be considered punitive disciplinary action. Plaintiff claims that the 2005 suspension was over one year old without subsequent similar behavior, and thus, pursuant to the union contract, could not be considered an active discipline serving as the basis for Plaintiff's termination.

Dean recommended that Plaintiff be fired. He stated that his decision was based on the Summary of Investigation, Plaintiff's past counselings and suspensions, and the alleged harassment of Perteet. On April 24, 2008, Easley, Union Representative Sharon Jones, and Supervisor Paul Akeo held a disciplinary conference during which the Summary of Investigation Report was to be reviewed, Plaintiff was to be interviewed about the planned discipline, and discipline was to be imposed as directed by Dean. Plaintiff indicates that Easley gave him a packet of Separation-from-State documents. He claims he was then told that he was terminated but that he did not say "one word" in response. Conversely, Defendant claims Plaintiff repeatedly cursed at Easley and yelled at Blackburn during the meeting. Plaintiff filed a grievance regarding his termination, but the arbitration went against him.

Plaintiff then brought suit in district court alleging, among other claims, employment discrimination in violation of Title VII, as well as interference with an entitlement and retaliation under the FMLA. On Defendant's motion, the district court granted summary judgment to Defendant on all of Plaintiff's claims. Plaintiff timely appealed.

## II. ANALYSIS

We review the district court's grant of summary judgment de novo. *Blackmore v. Kalamazoo Cty.*, 390 F.3d 890, 894 (6th Cir. 2004). Summary judgment is appropriate where there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Defendant bears the burden of showing the absence of a genuine dispute of material fact as to at least one essential element of Plaintiff's claims. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Plaintiff must then present sufficient evidence from which a jury could reasonably find in his favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). We then consider whether, drawing all reasonable inferences in favor of Plaintiff, Defendant must prevail as a matter of law. *Harrison v. Ash*, 539 F.3d 510, 516 (6th Cir. 2008).

The district court correctly determined that Plaintiff has not presented sufficient direct or circumstantial evidence showing he was terminated because of his race, and so his Title VII claim must fail. However, the district court erred in finding that Plaintiff had not pled a valid, FMLA-protected absence. Because Plaintiff raises a genuine dispute of material fact with regard to his FMLA interference and retaliation claims, these claims survive summary judgment.

## A. Plaintiff's Title VII Claim

Plaintiff claims that his termination was racially motivated. Title VII makes it an unlawful employment practice for an employer to "discharge any individual, or otherwise to discriminate against any individual . . . because of such individual's race." 42 U.S.C. § 2000e-2(a)(1). A plaintiff may establish racial discrimination through the use of direct evidence, or by introducing circumstantial evidence using the familiar burden-shifting framework articulated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

Plaintiff first brings a theory of direct evidence, alleging that the Hall-Thiam report amounts to direct evidence that race was a motivating factor in his termination. He supports this suggestion by reasoning that Hall-Thiam demonstrated racial animus toward Plaintiff through her report, and that Dean became the conduit of her prejudice. Alternatively, Plaintiff claims the circumstantial evidence that his firing was racially motivated is sufficient to overcome the *McDonell Douglas* burden-shifting framework. Both theories fail.

### 1. Direct Evidence of Racial Discrimination

Plaintiff alleges that the Hall-Thiam report supplies direct evidence that race was considered in his discharge. But the report shows only that Hall-Thiam made a conclusory assumption that Plaintiff was motivated by race in harassing Perteet. Although one could infer that Hall-Thiam may have been racially motivated herself, because one must draw an inference to determine her motivation, the report does not amount to direct evidence of discriminatory animus. *See Johnson v. Kroger Co.*, 319

F.3d 858, 865 (6th Cir. 2003) (stating "direct evidence of discrimination does not require a fact finder to draw any inferences in order to conclude that the challenged employment action was motivated, at least in part by prejudice against members of the protected group"). For example, we have found that, if proven, a supervisor's statement that she chose a particular candidate in order to "maintain racial balance" constituted direct evidence of discriminatory intent. *Taylor v. Board of Educ. of Memphis City Schools*, 240 F. App'x 717, 720 (6th Cir. 2007).

Even if Hall-Thiam's report directly evinces racial animus, Plaintiff has not shown that her intent to discriminate can be imputed to Dean—the ultimate decisionmaker in Plaintiff's termination. We have recognized that a plaintiff may show discrimination by offering evidence of a "'causal nexus' between the ultimate decisionmaker's decision to terminate the plaintiff and the supervisor's discriminatory animus." *Madden v. Chattanooga City Wide Serv. Dep't*, 549 F.3d 666, 677 (6th Cir. 2008). Plaintiff must show that "[b]y relying on this discriminatory information flow, the ultimate decisionmakers acted as the conduit of [the supervisor's] prejudice—his cat's paw." *Id.* at 678 (internal quotations omitted). Plaintiff cannot make this showing.

Defendant conducted an independent investigation at Dean's direction that breaks the causal chain between Hall-Thiam's alleged animus and Dean's action. Although the Supreme Court has declined to adopt a hard-and-fast rule that a decisionmaker's independent investigation negates prior discriminatory intent, it has concluded that "if the employer's investigation results in an adverse action for reasons unrelated to the supervisor's original biased action . . . then the employer will not be liable. But the supervisor's biased report may remain a causal factor if the independent investigation takes it into account without determining that the adverse action was, apart from the supervisor's recommendation, entirely justified." *Staub v. Proctor Hosp.*, 131 S.Ct. 1186, 1193 (2011) (interpreting the Uniformed Services Employment and Reemployment Rights Act, but noting that the language in that Act is "very similar to Title VII", *id.* at 1191).

In this case, the Office of Labor Relations' investigation determined that Plaintiff's termination was, apart from Hall-Thiam's unsupported conclusion that Plaintiff's harassment may have been racially motivated, entirely justified. After receiving Hall-Thiam's report, Dean sent an email specifically stating that the Office of Labor Relations would not initiate discipline based on the report. He then instructed Chief Blackburn to conduct a separate investigation that was narrowly focused on the harassment of Perteet and the disruption of the work environment, which were ultimately the reasons Plaintiff was fired. Even viewing the record in the light most favorable to Plaintiff, the investigation consisted of interviews with seven witnesses, all of whom confirmed the allegation that Plaintiff's actions were disruptive in the workplace. The Summary of Investigation concluded that Plaintiff had violated four work rules, only one of which was related to Hall-Thiam's report, and each of which would have individually supported a termination. Therefore, even if Hall-Thiam's report demonstrates that she harbored discriminatory animus toward Plaintiff, Dean's independent investigation demonstrates that Hall-Thiam did not use Dean as a cat's paw to accomplish her allegedly racially motivated aims.

Plaintiff has failed to provide direct evidence of Hall-Thiam's alleged discriminatory animus, and has further come up short in his attempts to undercut the effect of Dean's investigation. Based on this analysis, Plaintiff cannot show direct evidence of discrimination through the cat's paw theory. Thus, in order to prevail, Plaintiff must present circumstantial evidence of discrimination using the *McDonnell Douglas* framework. *See McDonnell Douglas Corp.*, 411 U.S. at 802.

### 2. Circumstantial Evidence of Discrimination

This Court applies a modified *McDonnell Douglas* framework when a majority plaintiff is involved. *See, e.g.*, *Zambetti v. Cuyahoga Cmty. Coll.*, 314 F.3d 249, 255 (6th Cir. 2002). Plaintiff must establish the first prong of a prima facie case by showing "background circumstances [to] support the suspicion that the defendant is that unusual employer who discriminates against the majority." *Id.* (internal quotations omitted). The other prongs remain familiar: (2) that the plaintiff was qualified for the job; and

(3) suffered an adverse employment action. *Arendale v. City of Memphis*, 519 F.3d 587, 603 (6th Cir. 2008). Under prong (4), Plaintiff must show that he was treated differently than similarly situated employees of a different race. *Id.* Defendant does not contest that Plaintiff was qualified for his position or that he suffered an adverse employment action. So, only the first and fourth prongs are at issue here.

As for the first prong, Plaintiff has submitted evidence that, due to a hiring policy that favored African Americans in the past, Plaintiff was one of few white employees on staff at Maxey. The district court rejected this evidence because it had to do with hiring and not firing, citing *Smith v. Leggett Wire Co.*, 220 F.3d 752, 762 (6th Cir. 2000). But the district court's reliance on that case was misplaced because it involved a minority plaintiff and the discussion cited has no relationship with the first prong of a reverse-discrimination case. *See id.* According to our precedent, Plaintiff may show the necessary "background circumstances" using "evidence of [defendants'] unlawful consideration of race as a factor in hiring in the past [, which] justifies a suspicion that incidents of capricious discrimination against whites because of their race may be likely." *Zambetti*, 314 F.3d at 256; *see also Campbell v. Hamilton Cty.*, 23 F. App'x 318, 324 (6th Cir. 2001); *Goller v. Ohio Dept. of Rehab. & Corr.*, 285 F. App'x 250, 255 (6th Cir. 2008). Accordingly, Plaintiff has submitted sufficient evidence to satisfy the first prong of the prima facie test.

But that is where Plaintiff's good fortune ends. When it comes to prong four, Plaintiff must make a showing that he was treated differently than similarly situated non-white employees. *Arendale*, 519 F.3d at 603. "In order to be considered 'similarly situated' for the purposes of comparison, the employment situation of the comparator must be similar to that of the plaintiff in all relevant aspects." *Highfill v. City of Memphis*, 425 F. App'x 470, 474 (6th Cir. 2011). On appeal, Plaintiff puts forward two ways in which he was treated differently than his colleagues: (1) he was disciplined for cursing but Easley and Perteet were not disciplined for allegedly using foul language while discussing a female employee; (2) both Plaintiff and Perteet filed claims against one another—Plaintiff was disciplined while Perteet was not. But, upon closer

inspection, neither of these claims, even if true, demonstrates that Plaintiff was unjustifiably treated differently than similarly situated employees.

As for the allegedly disparate approaches to discipline for cursing, Plaintiff's behavior was not the same as Easley and Perteet's alleged conduct because Plaintiff has not demonstrated that Easley and Perteet's foul language was overheard by anyone other than Plaintiff. This undercuts Plaintiff's claim for two reasons: first, the complaint against Plaintiff was substantiated by a witness, but his complaint against Easley and Perteet was not; second, and more importantly, the complaint against Plaintiff involved language that a youth resident overheard, whereas Easley and Perteet's alleged comment did not affect any youth residents. Therefore, Plaintiff's discipline related to cursing was not the same conduct that he reported against Easley and Perteet, and it cannot form the basis for his disparate treatment claim.

With regard to the alleged disparate reaction to complaints, the purportedly similar instances that Plaintiff puts forward are distinct from one another. The claims that Plaintiff advanced based on sexual harassment of others are simply not comparable to Perteet's claims that Plaintiff harassed him—this is not the same conduct. While Plaintiff's claim that Perteet threatened him and Perteet's claim that Plaintiff harassed him involve more similar conduct, Plaintiff's claim, which allegedly took place between just he and Perteet, could not be substantiated. But Perteet's claim was substantiated through interviews with several other employees. The union contract requires that allegations be investigated and substantiated in order to form the basis of a discipline. Furthermore, Plaintiff's complaint was directed to a federal agency and there is no evidence that Defendant was aware of it, while Perteet's was handled by a state agency that worked closely with Defendant. Therefore, the lack of discipline in reaction to Plaintiff's allegation can be easily distinguished from Plaintiff's discipline arising out of Perteet's harassment claim.

Plaintiff has failed to demonstrate any specific way in which he was treated differently than a similarly situated non-white employee. Accordingly, he cannot satisfy

the fourth prong of the prima facie test.  Therefore, Plaintiff cannot state a claim using circumstantial evidence of discrimination.

> 3.     *Defendant's Asserted Legitimate, Non-Discriminatory Reasons for Termination*

Even if Plaintiff could establish a prima facie case, Defendant has asserted legitimate, non-discriminatory reasons for Plaintiff's termination that Plaintiff has not shown to be pretextual.  If an employee establishes a prima facie case of discrimination, the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for its actions.  *Texas Dep't of Comty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981).  Then the burden shifts back to the employee to make a showing that the stated reason is pretextual.  *Id.*  Defendant's burden of articulating a legitimate, nondiscriminatory reason for its decision to discharge Plaintiff is satisfied if Defendant "explains what [it] has done or produces evidence of legitimate nondiscriminatory reasons."  *Id.* at 256 (internal quotation omitted).

Defendant points to the Summary of Investigation.  There, Defendant stated that Plaintiff was being fired because he had accumulated his sixth active discipline by violating four separate work rules stemming from Plaintiff's ongoing harassment of Perteet.  It also provides that, given Plaintiff's disciplinary history, a violation of any one of the four work rules for which he was issued the final discipline would have independently supported dismissal.

"Under the law of our circuit, a plaintiff can show pretext in three interrelated ways: (1) that the proffered reasons had no basis in fact, (2) that the proffered reasons did not actually motivate the employer's action, or (3) that they were insufficient to motivate the employer's action."  *Chen v. Dow Chemical Co.*, 580 F.3d 394, 400 (6th Cir. 2009).  Plaintiff argues that the proffered reasons did not actually motivate Defendant's action and that the proffered reasons were insufficient to support termination.  More specifically, Plaintiff contends that Plaintiff's union contract would not support termination on the proffered grounds and that the Hall-Thiam report, tainted with alleged racial animus, was the true motivation behind the decision to terminate him.

Defendant can overcome Plaintiff's claims of pretext if it is "able to establish its reasonable reliance on the particularized facts that were before it at the time the decision was made." *Wright v. Murray Guard Inc.*, 455 F.3d 702, 707–08 (6th Cir. 2006) (internal quotation omitted). "'[T]he key inquiry is whether the employer made a reasonably informed and considered decision before taking an adverse employment action.'" *Id.* at 708 (quoting *Burdine*, 450 U.S. at 256).

None of Plaintiff's claims regarding pretext undermine Defendant's assertion that it had a well-founded belief, based on the particularized facts in the Summary of Investigation, that Plaintiff was harassing Perteet and that, based on Plaintiff's history, this behavior justified termination. The Summary of Investigation includes particularized facts in the form of statements from several of Plaintiff's coworkers and admissions from Plaintiff himself implicating him in the violation of four work rules which culminated in a discipline. According to the Summary of Investigation, this was Plaintiff's sixth discipline. Although Plaintiff contests the validity of at least two of those disciplines, this dispute is immaterial because it does not undermine Dean's well-founded belief in the particularized facts that were set forth in the Summary of Investigation at the time Plaintiff was fired. *See Wright*, 455 F.3d at 708. Defendant need not prove all of the statements in the Summary of Investigation were correct, but rather that it made its decision to terminate Plaintiff "based on an honestly held belief in a nondiscriminatory reason supported by particularized facts after a reasonably thorough investigation." *Id.* at 708. Here, Defendant has done just that.

Defendant's reliance on the Summary of Investigation is comparable to reliance that this Court has found reasonable in other employment discrimination cases. For example, in *Wright v. Murray Guard, Inc.*, 455 F.3d at 708, this Court accepted a defendant's offer of evidence that it relied on an anonymous letter, testimony from the alleged victims of harassment, and documented performance problems in deciding to terminate plaintiff. *Id.* at 708–09. The information in the Summary of Investigation is at least as worthy to be relied upon by Defendant as the information relied upon in

*Wright*. Thus, Plaintiff has not shown that Defendant's proffered reasons for firing him were pretextual.

In short, Plaintiff cannot make out a prima facie case of discrimination using direct or circumstantial evidence. Even if he could, he cannot overcome Defendant's legitimate and nondiscriminatory reasons for firing him. Therefore, we affirm the decision of the district court to grant summary judgment to Defendant with regard to Plaintiff's Title VII claim.

## B. Plaintiff's FMLA Claims

The FMLA recognizes two types of claims: interference claims, in which employers burden or outright deny substantive statutory rights to which their employees are entitled; and retaliation claims, in which employers initiate adverse employment actions against employees for exercising their FMLA right to take leave. 29 U.S.C. §§ 2615(a)(1),(2). Plaintiff asserts both interference and retaliation claims.

### 1. Interference with FMLA Entitlement

To establish Defendant interfered with his FMLA rights, Plaintiff must show that (1) he was an eligible employee; (2) Defendant was an employer subject to the FMLA; (3) he was entitled to leave under the FMLA; (4) he gave his employer notice of his intention to take FMLA leave; and (5) Defendant denied him FMLA benefits to which he was entitled. *Grace v. USCAR & Bartec Tech. Servs.*, 521 F.3d 655, 669 (6th Cir. 2008). The parties do not contest the first three prongs and, taking the facts in the light most favorable to Plaintiff, he has created a factual dispute as to the fourth. Thus, Plaintiff's interference claim hinges upon whether he was denied FMLA benefits to which he was entitled.

Plaintiff claims that Defendant interfered with his entitlement to take FMLA leave. 29 U.S.C. § 2612(a)(1)(c). Under FMLA regulations, an employee must be "needed to care for" the family member in order to be entitled to FMLA leave, which

encompasses both psychological comfort and physical care.  29 C.F.R. §§ 825.100, 825.116.[2]  Further:

> [t]he term also includes situations where the employee may be needed to fill in for others who are caring for the family member, or to make arrangements for changes in care, such as transfer to a nursing home.

§ 825.116(b).  Plaintiff submits that his situation—in which he sought leave to go to the hospital in order to make a decision with his sister regarding whether his mother should continue on life support—is embraced by this language.  He is correct.

The district court reasoned that the phrase "needed to care for" did not provide for all members to be there simultaneously to care for their family member, and thus, Plaintiff's situation was not included.  In so holding, the district court focused on the fact that family members could be entitled to leave in order to fill in for other family members and reasoned that, because Plaintiff's sister was present to care for their mother, the FMLA did not entitle Plaintiff to leave as well.  *See* 29 C.F.R. § 825.116(b).  However, this section was recently clarified, adding "[t]he employee need not be the only individual or family member available to care for the family member."  29 C.F.R. § 825.124(b).  The Department of Labor's Final Rule states that this addition was merely a clarification:

> The current regulations define the phrase "needed to care for" a family member in § 825.116. The proposed rule moved this section to § 825.124 without making any substantive changes, other than to clarify that the employee need not be the only individual, or even the only family member, available to provide care to the family member with a serious health condition.

73 F.R. § 67934-0.  Based on the plain language of the regulations, the clarity of which is enhanced by the more recent Final Rule, Plaintiff is correct that he was "needed to care for" his mother within the meaning of the regulations.  So, the district court's interpretation of this language was incorrect.

---

[2]The FMLA regulations were updated effective January 15, 2009, and § 825.116 is now found at § 825.124.  The prior version of the regulations, effective during Plaintiff's absence in 2007, is applicable here.

Moreover, the same section provides that family members are entitled to leave "to make arrangements for changes in care, such as transfer to a nursing home." 29 C.F.R. § 825.116(b). This "make arrangements" clause is not limited to those instances where the employee is subbing in for another family member, as it is stated in a disjunctive manner, i.e. "*or* to make arrangements . . . ." *See id.* A decision regarding whether an ill mother should stay on life support would logically be encompassed by "arrangements for changes in care." To be sure, this is the kind of decision, like transfer to a nursing home, that few people would relish making without the help of other family members, and the regulations do not force them to do so.

To defeat summary judgment on his FMLA interference claim, Plaintiff must also create a factual dispute as to whether the denial was based on a legitimate business reason. *Grace*, 521 F.3d at 670. "[I]nterference with an employee's FMLA rights does not constitute a violation if the employer has a legitimate reason unrelated to the exercise of FMLA rights for engaging in the challenged conduct." *Edgar v. JAC Prods., Inc.*, 443 F.3d 501, 508 (6th Cir. 2006). If Defendant proffers such a justification, then Plaintiff may seek to rebut it by showing, among other things, that the excuse was insufficient to warrant the challenged conduct. *See Grace*, 521 F.3d at 670.

Here, although Defendant claims that, because Maxey is a secure facility, it needs to have coverage for all of the open shifts, Plaintiff has rebutted that claimed reason for denying him leave to see his mother by offering testimony that he had a volunteer available to take over for him. So it would seem that, under Plaintiff's version of the facts, he complied with Maxey's policy. Further, Easley has stated that if Plaintiff would have mentioned he was leaving to go see his mother, Plaintiff would not have been mandated to stay—calling into question the need for constant coverage of every post, or the necessity that Plaintiff stay for the extra shift. This testimony creates a factual dispute regarding Plaintiff's interference claim. *See Grace*, 521 F.3d at 670–71 (reversing the grant of summary judgment where plaintiff raised a genuine dispute as to whether her position had actually been eliminated during her FMLA leave, as her employer claimed).

### 2. *Retaliation for Using FMLA Leave*

Plaintiff finally alleges that he was retaliated against for exercising his FMLA rights when he received a one-day suspension for "abandoning his shift" when he admittedly left his post without permission. Plaintiff further alleges that this discipline factored into Defendant's decision to terminate him, resulting in further harm.

We also apply the *McDonnell Douglas* burden-shifting framework to FMLA retaliation claims. *Edgar*, 443 F.3d at 508. To establish a prima facie case, Plaintiff must show that (1) he engaged in an activity protected by the Act; (2) Defendant took an adverse employment action against him; and (3) that there was a causal connection between the protected activity and the adverse employment action. *Id.* Plaintiff took protected leave, and was suspended for it. The causal connection is established in that Plaintiff's suspension letter stated he was being punished for "leaving the facility and abandoning [his] shift."

After an employee establishes a prima facie case of FMLA retaliation, the burden shifts to the defendant to establish a legitimate, non-discriminatory reason for its action. *Id.* Defendant contends that Plaintiff failed to follow proper procedures because he abandoned his post. *See* 29 C.F.R. § 825.303(c) (requiring employees to use an employer's usual notification procedures for taking FMLA-qualified leave). But, again, Plaintiff asserts that he had a volunteer ready to fill his post; so according to his version of the facts, he did not abandon it. Defendant also claims that "Officers who are responsible for the security of a detention center, the safety of staff, and the safety of the youths in custody cannot be permitted to leave their post without letting *somebody* in management know." But according to his version of the facts, Plaintiff did let *somebody* in management know what was going on—he claims he told Easley his mother was dying. Moreover, Defendant undercuts its own argument by offering Easley's testimony "[i]f he'd have said anything about his mother he wouldn't have been mandated, period." If Easley would have given Plaintiff permission to leave right away if he had explained his mother's condition—despite his need to cover Plaintiff's post—it suggests that either the importance of having all posts covered at all times is diminished, or there was

another employee who was available or could have been called in to cover the post. So, Plaintiff has raised sufficient facts to show Defendant's proffered reason for discipline may have been pretextual.

Based on this analysis, Plaintiff has created a genuine issue of material fact regarding whether Defendant retaliated against him for exercising his FMLA rights.

### 3. Harm to Plaintiff

The FMLA is not a strict-liability statute, so Plaintiff must establish that Defendant's alleged violation caused him harm. *See Ragsdale v. Wolverine World Wide, Inc.*, 535 U.S. 81, 89 (2002) (stating that the statute "provides no relief unless the employee has been prejudiced by the violation"). Here, Plaintiff has demonstrated that he was suspended because he left work to go to the hospital, which caused him, at least, to lose pay for that day. This is sufficient to claim he was harmed by the alleged interference and retaliation. Plaintiff also claims that the suspension was later part of the basis on which he was terminated. Defendant claims that Plaintiff would have been fired even without that absence, but that is a factual dispute which goes to Plaintiff's damages, not his ability to survive summary judgment.

Plaintiff has demonstrated harm stemming from alleged interference with leave he was entitled to under the FMLA and from retaliation for taking his FMLA-protected absence. Accordingly, Plaintiff has met the requirements of the *McDonnell Douglas* framework and his FMLA claims survive summary judgment.

### III. CONCLUSION

Based on this analysis, we **AFFIRM** the district court's decision to grant summary judgment to Defendant with regard to Plaintiff's Title VII claim. However, we **VACATE** the district court's decision to grant summary judgment to Defendant as to Plaintiff's FMLA claims and **REMAND** the case for further proceedings in accordance with this opinion.