**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 12a0802n.06

No. 11-5635

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**

**_Jul 24, 2012_**

LEONARD GREEN, Clerk

| | | |
|---|---|---|
| LUCILLE M. COLLINS, | ) | |
| | ) | |
| Plaintiff-Appellant, | ) | |
| | ) | ON APPEAL FROM THE |
| v. | ) | UNITED STATES DISTRICT |
| | ) | COURT FOR THE WESTERN |
| MEMPHIS GOODWILL INDUSTRIES, | ) | DISTRICT OF TENNESSEE |
| INC., | ) | |
| | ) | |
| Defendant-Appellee. | ) | |

BEFORE: SUTTON, McKEAGUE, and RIPPLE,[*] Circuit Judges.

**RIPPLE, Circuit Judge**. Lucille Collins brought this action against her former employer, Memphis Goodwill Industries, Inc. ("Goodwill"). Ms. Collins alleged that Goodwill: (1) had discriminated against her based on her sex in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, and of the Tennessee Human Rights Act ("THRA"), Tenn. Code Ann. § 4-21-101 *et seq.*; (2) had retaliated against her for engaging in protected activity in violation of Title VII and the THRA; and (3) had intentionally inflicted emotional distress upon her in violation of the common law of Tennessee. Goodwill moved for summary judgment on all counts, and the

---

[*]The Honorable Kenneth F. Ripple, United States Court of Appeals for the Seventh Circuit, sitting by designation.

district court granted Goodwill's motion.[1]  Ms. Collins has appealed, and we now affirm the judgment of the district court.[2]

# I

## BACKGROUND

### A. Facts

Goodwill is a non-profit organization that provides job training and employment to individuals with severe physical or mental disabilities.  To that end, Goodwill enters into contracts with various governmental offices in the Memphis area to provide janitorial services.  Over three-fourths of the workers that Goodwill employs to perform these duties are disabled.  Willie Walker is Goodwill's president, and Tony Martini is its CEO.

#### 1. Ms. Collins's Employment

In 2004, Goodwill acquired the contract for janitorial services at the federal building in Jackson, Tennessee.  Ms. Collins had been the previous contractor's project supervisor, and Goodwill retained her as a project manager.  This position required her to "manage the workforce, inspect the buildings, handle customer complaints, and also interact with the customers to make sure that their needs were met according to contract standards."[3]  Her work was inspected by Layne King,

---

[1]The district court's jurisdiction was predicated on 28 U.S.C. §§ 1331, 1367(a), as well as on 42 U.S.C. § 2000e-5(f)(3).

[2]Our jurisdiction is secure under 28 U.S.C. § 1291.

[3]R.25-2 at 7 (Walker Dep. 19).

who was responsible for Goodwill's quality control. King testified that "[t]he work that [Ms. Collins] supervised was well done."[4] It does not appear from the record that Ms. Collins supervised individuals with disabilities in this position.

According to King, someone "complain[ed] about the way that [Ms. Collins] addressed the tenants" at the Jackson facility, which caused him to "talk[] to [Ms. Collins] about softening her approach a bit."[5] Thereafter, someone from the Jackson federal building requested that Ms. Collins "be removed from the facility due to the fact that she was intimidating the ones that were working within the federal building."[6] In an affidavit, however, Ms. Collins testified that she "worked without incident" during this period and that she "had no notice of any problems regarding how [she] spoke to employees" until several years later.[7] Nevertheless, in August 2006, Ms. Collins was transferred by Goodwill to work at the IRS building in Memphis, Tennessee. Walker testified that this transfer came at the request of the federal building employee noted above. Walker had not

---

[4]R.31-1 at 3 (King Dep. 17); *see also* R.31-2 at 2 (Walker Dep. 21); R.25-2 at 8 (Walker Dep. 22).

[5]R.25-3 at 9 (King Dep. 18).

[6]R.25-2 at 8 (Walker Dep. 22).

[7]R.28-1 at 2. Although Ms. Collins's affidavit does not indicate precisely when she was put on notice that Goodwill had problems with the manner in which she spoke to employees, the charge of discrimination she filed with the EEOC makes clear that she had such notice by February 2009. *See* R.1-1 (Charge of Discrimination).

terminated Ms. Collins at that time because the customer had not provided names, details or "anything documented as to what [Ms. Collins] had done."[8]

Upon her transfer, Ms. Collins served as a trainer and was later named a quality control inspector. In her quality-control capacity, Ms. Collins "inspected the building to ensure that [Goodwill] w[as] meeting the contract requirements in [its] cleaning work."[9] Ms. Collins's work in Memphis was "meticulous[,] . . . thorough and extremely well[-]documented."[10]

At some point in mid- to late-January 2009, the chief of the Building Delegation Section at the IRS building called Walker and "complained that some [Goodwill] employees had come to him and complained about Ms. Collins and also that some of the Internal Revenue [Service] staff had reported to him that they had observed her speaking harshly to some of [the] Goodwill employees."[11] Walker told the IRS representative that he "would look into the matter and get back with him."[12] Within the next few days, Walker asked "Ms. Collins . . . if there were any issues or any problems that [they] needed to talk about, and she said no."[13] Walker did not bring up any of the complaints against her because he did not believe that he had enough details about what she was alleged to have

---

[8]R.25-2 at 10 (Walker Dep. 26).

[9]R.25-3 at 10-11 (King Dep. 19-20).

[10]*Id.* at 13 (King Dep. 23).

[11]R.25-2 at 16 (Walker Dep. 53).

[12]*Id.* at 17 (Walker Dep. 54).

[13]*Id.*

done. Walker then asked another supervisor whether there were any issues, and she also said that there were none.

Walker informed the IRS representative that he "didn't find anything that was out of the order [sic]."[14] Thereafter, the IRS representative sent Walker an email that "made it clear [to Walker] that there were issues as far as [the IRS representative] was concerned."[15] The email provided, in pertinent part:

> I wanted to inform you that my manager was approached by some Goodwill employees who were upset about the harsh manner in which Ms. Collins has been speaking with them. Early this month a similar report was levied by an IRS employee, where that IRS employee overheard Ms. Collins speaking harshly to a Goodwill employee.[16]

Walker later described his reaction to the email: "Now, I will take some action because he had actually put something in writing for me to refer back to."[17]

Walker spoke with approximately eight to ten employees on February 13 and asked, without mentioning anyone by name or accusing any individual of misbehavior, whether anyone had said anything harsh or cruel to them. The employees said that they had not experienced such behavior.

---

[14]*Id.* at 19 (Walker Dep. 56).

[15]*Id.*

[16]R.25-5 at 2.

[17]R.25-2 at 19 (Walker Dep. 56).

Walker then "talked with [Ms.] Collins about the accusation that she was talking to other employees harshly" and "inform[ed] her that this would not be tolerated by [anyone] working for Goodwill."[18]

After this investigation, Walker sent the IRS representative an email explaining that he "did not find anything that verifies that [Ms.] Collins missed treated [sic] any of the employees."[19] Within two weeks of that email, the IRS representative informed Walker "that the problem still exists, and it has not been cared for."[20] Walker replied "that due to [his] investigation, once again, [he] found nothing improper about Ms. Collins as far as doing any wrongdoing, and [he could not] discipline her."[21]

Thereafter, the IRS representative brought his complaints to Martini, who, as Goodwill's CEO, was Walker's supervisor. Various IRS officials then met with Martini and a representative from the National Institute for the Severely Handicapped. Walker was not at this meeting; he was told that the IRS no longer wanted him to investigate this matter "because they felt that the employees were afraid of [him]."[22] When the meeting was over, Martini asked King to investigate the allegations.

---

[18]R.25-5 at 1; *accord* R.1-1 (Charge of Discrimination) (indicating that "on February 13, 2009, Willie Walker, President (Male)[,] stated that he would not tolerate anyone being hostile toward employees").

[19]R.25-5 at 1.

[20]R.25-2 at 24 (Walker Dep. 66).

[21]*Id.* at 25-26 (Walker Dep. 71-72).

[22]*Id.* at 29 (Walker Dep. 76).

King was aware that the IRS believed that Walker's investigation had not "gotten to the truth," which King suspected "may have been because of the way that the questions were asked and by whom they were asked, considering the population" at issue.[23] He therefore was assisted by a case manager, whose job was to act as an advocate for Goodwill's disabled employees. King believed that the case manager's involvement would facilitate his investigation because the employees were very comfortable with her. As this investigation was getting underway, Ms. Collins sent the following email to King, with Walker and Martini copied thereon:

> I feel threaten [sic] when I go to work by Project Manager, Asst. Project Manager, Employees and Internal Revenue Management and Staff. I can not [sic] sleep at night, I can not [sic] do my work to the best of my ability because I have to watch my back at all time [sic] because of the lies that these people are telling I am very nervous when I come and leave from work.[24]

With the case manager's assistance, King interviewed approximately 29 employees during the course of his investigation. After doing so, he determined that "approximately 11 people . . . felt that [Ms. Collins] created a hostile work environment for them, and that is hard to fix, if not impossible."[25] These eleven employees "stated that Lucille Collins made them feel uncomfortable on the job due to her use of profanity, rude comments, and intimidation."[26] Several employees said that Ms. Collins had threatened their jobs, and one employee said that Ms. Collins had threatened

---

[23]R.25-3 at 23 (King Dep. 41).

[24]R.25-7.

[25]R.25-3 at 28 (King Dep. 51).

[26]R.25-6 at 10 (King Report).

to "have her husband . . . do something to [him],"[27] a comment that was corroborated by another supervisor.[28] Furthermore, many employees told King that Ms. Collins would curse in the workplace, and three said that Ms. Collins would say that the employees could tell their "mammies" or "mommas and daddies" for all she cared.[29] Several employees also informed King that she would scream or holler at them.

Ms. Collins attended an interview with King and the case manager during this investigation. Although she refused to answer any of King's questions, she now emphasizes that King's "investigation **did not** include a statement from [her] and several additional employees that [she] wanted to include."[30] However, she has put forward no evidence of what steps, if any, she took to provide King with her side of the story after she refused to speak with him.

At some point, apparently during King's investigation, Ms. Collins was suspended for three days. After Martini received King's report, Martini decided that her employment with Goodwill should be terminated, which the report recommended. This decision was communicated to Ms. Collins on March 19 or 20, 2009.

---

[27]*Id.* at 5.

[28]*Id.* at 3; *see also id.* at 4 (describing statement of the corroborating supervisor who said that Ms. Collins "makes comments of physical threats and idle threats").

[29]*Id.* at 1-5.

[30]R.28-1 at 2 (Collins Aff.) (emphasis in original).

## 2. Proposed Comparators

Ms. Collins's sex discrimination claim made reference to two male co-workers who allegedly engaged in similar conduct. The first of these employees was Clarence Hampton. Ms. Collins and a janitor each complained that Hampton had cursed on the job. Walker testified that Hampton was not disciplined as a result of Ms. Collins's complaint because the complaint could not be corroborated. However, the janitor's complaint was corroborated, and Hampton was suspended for three days as a result. Walker testified that one corroborated incident of cursing did not rise to the level of terminable conduct.

The second comparator that Ms. Collins proposed was Robert Shaw, another supervisor. The record reveals that three employees raised complaints about Shaw. During King's investigation, a blind employee said: "Robert [Shaw] has been telling me that I can't see. He tells me that I am blind and I know I can't see, but I don't need him to tell me this."[31] Two other employees indicated that Shaw had hollered or yelled at them.[32] In his report, King noted these incidents and concluded that Shaw "has created or is in the process[] of creating a hostile work environment for at least three employees."[33] He recommended: "At a minimum, counsel Robert Shaw on appropriate interaction

---

[31]R.25-6 at 2 (King Report).

[32]One of these two employees also had made her concerns known to Walker, who did not discipline Shaw at the time because there was "[n]o proof . . . except for her making the allegation." R.25-2 at 43 (Walker Dep. 112).

[33]R.25-6 at 12 (King Report).

with disabled employees and the proper methods of communicating with employees."[34]  Ms. Collins

has put forward no evidence as to whether Martini followed this recommendation.

## B.  District Court Proceedings

Ms. Collins filed a charge of discrimination[35] with the Equal Employment Opportunity

Commission ("EEOC"), asserting that Goodwill had discriminated against her based on her sex and

retaliated against her for reporting what she perceived to be a hostile work environment to Goodwill

and to the EEOC.  The EEOC issued Ms. Collins a right to sue letter, and she instituted this action

on October 28, 2009, alleging sex discrimination, retaliation and the intentional infliction of

emotional distress.  After discovery, Goodwill moved for summary judgment on all three counts.

The district court granted the motion and entered judgment in favor of Goodwill.  The court

first determined that Ms. Collins could not establish a prima facie case of sex discrimination because

she was not qualified for her position and because neither Shaw nor Hampton were similarly situated

to her.  It then rejected Ms. Collins's retaliation claim, concluding that the threat Ms. Collins

referenced in her email was a "generalized statement" that was "not sufficient to constitute protected

---

[34]*Id.*

[35]Although it is not clear precisely when the charge that appears in the record was filed, it bears a "RECEIVED" stamp from the EEOC office dated April 15, 2009.  R.1-1.  The EEOC's Notice of charge of discrimination that was subsequently sent to Goodwill is dated April 16, 2009. R.31-3.

activity under the statute."[36]   Finally, the district court summarily rejected Ms. Collins's claim of

intentional infliction of emotional distress.

## II

## DISCUSSION

### A.  Standard of Review

Our review of an entry of a summary judgment is de novo.  *Berryman v. SuperValu Holdings,*

*Inc.*, 669 F.3d 714, 716 (6th Cir. 2012).  "The court shall grant summary judgment if the movant

shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment

as a matter of law."  Fed. R. Civ. P. 56(a).  All reasonable inferences must be drawn in the light most

favorable to Ms. Collins.  *Berryman*, 669 F.3d at 719.  We "may affirm on any grounds supported

by the record."  *Pahssen ex rel. Doe v. Merrill Cmty. Sch. Dist.*, 668 F.3d 356, 362 (6th Cir. 2012).

### B.  Sex Discrimination

Ms. Collins claims that Goodwill violated Title VII by terminating her on account of her sex,

and she proceeds under the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411

U.S. 792 (1973).[37]   To establish a prima facie case of discrimination, Ms. Collins must show that:

---

[36]R.33 at 12.  The district court did not consider whether Goodwill was entitled to summary judgment on Ms. Collins's claim that Goodwill retaliated against her for filing a charge of discrimination with the EEOC.

[37]Neither party has addressed *Gossett v. Tractor Supply Co.*, 320 S.W.3d 777, 785 (Tenn. 2010), in which the Supreme Court of Tennessee "h[e]ld that the *McDonnell Douglas* framework is . . . incompatible with Tennessee summary judgment jurisprudence."  Because the parties rely exclusively on Title VII cases, and because pre-*Gossett* cases from both Tennessee courts and this court "evaluated claims brought under the THRA in the same manner as Title VII claims," our

(1) "she was a member of a protected class;" (2) "she suffered an adverse employment action;" (3) "she was qualified for the position;" and (4) "she was replaced by someone outside the protected class or was treated differently than similarly-situated, non-protected employees." *Wright v. Murray Guard, Inc.*, 455 F.3d 702, 707 (6th Cir. 2006) (internal quotation marks omitted). If she does so, Goodwill then will "bear[] the burden of production to put forth a legitimate, nondiscriminatory reason for the complained of adverse treatment." *Id.* at 706 (internal quotation marks omitted). If Goodwill satisfies its burden, the burden shifts to Ms. Collins to show that Goodwill's reason was pretexual. *Id.* at 706-07.

We assume without deciding that Ms. Collins has made out a prima facie case. Additionally, we observe that Goodwill has put forth a nondiscriminatory reason for Ms. Collins's termination: the IRS, one of Goodwill's most important clients, complained about Ms. Collins's conduct, and eleven employees confirmed that she had cursed at them or otherwise intimidated them. Therefore, Ms. Collins has the burden of proving that this reason is pretextual, which she may do by showing: "(1) that the proffered reasons had no basis in fact, (2) that the proffered reasons did not actually motivate the employer's action, or (3) that they were insufficient to motivate the employer's action."

---

disposition of Ms. Collins's Title VII claims "appl[ies] with equal force to her THRA-based claim[s]." *Sybrandt v. Home Depot, U.S.A., Inc.*, 560 F.3d 553, 557 (6th Cir. 2009); *see Blandford v. Exxon Mobile Corp.*, No. 10-5795, 2012 WL 1994734, at *6 (6th Cir. June 5, 2012) (declining to address the effect of *Gossett* where the case was first called to this court's attention in a reply brief); *Theus v. GlaxoSmithKline*, 452 F. App'x 596, 602 n.8 (6th Cir. 2011) (treating the holding of *Gossett* as procedural rather than substantive where the plaintiff "ma[de] no argument to the contrary").

*Romans v. Michigan Dep't of Human Servs.*, 668 F.3d 826, 839 (6th Cir. 2012) (internal quotation marks omitted).

We begin by observing that Goodwill "made its decision to terminate [Ms. Collins] based on an honestly held belief in a nondiscriminatory reason supported by particularized facts after a reasonably thorough investigation." *Id.* (internal quotation marks omitted). King's report, which Martini ordered and then considered before terminating Ms. Collins, described the answers that twenty-nine Goodwill employees gave to various questions regarding their work environments. The report also contained a summary of King's findings, which included the following with respect to Ms. Collins: that "[e]leven of the employees stated that [she] made them feel uncomfortable on the job due to her use of profanity, rude comments, and intimidation;" that "one employee stated [she] made a physical threat of having her husband . . . do something to [the employee];" that "[s]even employees stated that [she] directly or indirectly threatened their jobs;" that "[t]hree employees stated that [she] used profanity[ but] did not curse directly at them;" that "[t]hree employees stated that [she] spoke to them in an excessively loud voice;" and that "[n]ine employees stated that [she] makes them uncomfortable at work and creates a hostile work environment due to her negative attitude with employees and the brusque way in which she speaks to employees."[38] Therefore, the report "includes particularized facts in the form of statements from several" of Goodwill's employees indicating that Ms. Collins was harassing them, which gave rise to "an honestly held belief in a nondiscriminatory reason" for terminating her after conducting "a reasonably thorough

---

[38]R.25-6 at 10-11 (King Report).

investigation." *Id.* (internal quotation marks omitted). Although Ms. Collins faults King's report

for not including a statement from her, she refused to speak with King when he attempted to

interview her, and she provides no evidence about what steps, if any, she took to submit her side of

the story to King.[39]

Moving beyond the results of the second investigation, Ms. Collins asserts that Goodwill's

*motivation* for undertaking this investigation was improper; that is, she suggests that Goodwill

ordered this second investigation because Walker's earlier investigation did not reach the desired

result. This theory finds no support in the record. What the record does reveal is that a

representative from the IRS--Goodwill's largest and most important customer--addressed a

complaint directly to Martini because he believed "that the problem still exist[ed]"[40] and "that the

employees were afraid of"[41] Walker, who conducted the first investigation. When King was asked

by Martini to conduct another investigation, King took steps to avoid the problem that the IRS had

perceived with the first investigation by bringing in a case manager whose "job is to make sure the[

employees] are treated fairly" and who "helps them resolve problems either on the job or often in

---

[39]*Cf. Carson v. Ford Motor Co.*, 413 F. App'x 820, 824 (6th Cir. 2011) (concluding that plaintiff failed to establish pretext, even though "he was never fully able to tell his side of the story," because there was no evidence that the investigation into his conduct was insufficient); *Haughton v. Orchid Automation*, 206 F. App'x 524, 533 (6th Cir. 2006) (concluding that plaintiff failed to establish pretext where employer interviewed the complaints and other employees who were present and offered the plaintiff two opportunities to explain himself).

[40]R.25-2 at 24 (Walker Dep. 66).

[41]*Id.* at 29 (Walker Dep. 76).

[their] own lives."[42]  The record establishes, moreover, that the decision to conduct a second investigation was well-founded.  During the course of that second investigation, it was revealed that Walker had been ineffective in his conduct of the first investigative effort and that employees had been treated inappropriately by Ms. Collins.  For instance, during the course of that investigation, an employee confirmed "that Willie Walker scared the employees and created a hostile work environment while addressing the situation with Lucille Collins."[43]  And, as we have noted earlier, "[e]leven of the employees stated that Lucille Collins made them feel uncomfortable on the job due to her use of profanity, rude comments, and intimidation."[44]  We have held previously that it is "entirely appropriate" for an employer to conduct a second investigation when it learns of new evidence.  *Wright*, 455 F.3d at 709 n.2.  That principle applies with equal force where the employer learns of problems with the first investigation and that a customer believes the problem about which it complained still exists.

Finally, Ms. Collins appears to assert that Goodwill's stated reasons were insufficient to justify her termination because Shaw and Hampton, the two male supervisors that she proposes as similarly situated comparators, were, in her view, treated less harshly than she was for engaging in similar conduct.  *See, e.g., Russell v. Univ. of Toledo*, 537 F.3d 596, 607 (6th Cir. 2008).  There is no merit to this contention.

---

[42]R.25-3 at 22 (King Dep. 40).

[43]R.25-6 at 10 (King Report).

[44]*Id.*

The record reveals only two complaints about Hampton, both of which were directed to, and handled by, Walker. However, it was Martini, not Walker, who made the decision to terminate Ms. Collins.[45] *See Smith v. Leggett Wire Co.*, 220 F.3d 752, 762-63 (6th Cir. 2000) (indicating that a comparison was "inapt" where, among other things, the plaintiff and the proposed comparator were disciplined by different decisionmakers). Furthermore, Ms. Collins's abusive language was overheard by employees of an important client, the IRS, while Hampton's was not. *Cf. Romans*, 668 F.3d at 838 (holding that a school employee whose foul language was overheard by a student could not be compared to other employees whose foul language was not overheard by students). Indeed, it was the IRS that called Ms. Collins's behavior to the attention of Martini. Additionally, Walker was able to corroborate only one incident of cursing by Hampton,[46] while eleven employees told King about Ms. Collins's ongoing intimidating behavior. Furthermore, King's report contained a corroborated account indicating that Ms. Collins had threatened to have her husband "do something" to one of the employees.[47] There is no evidence of Hampton ever making a statement in the workplace that could be perceived as a physical threat. When presented with this evidence, no reasonable jury could conclude that Ms. Collins and Hampton "engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the

---

[45]R.25-2 at 38 (Walker Dep. 99).

[46]*Cf. Romans v. Michigan Dep't of Human Servs.*, 668 F.3d 826, 838 (6th Cir. 2012) (concluding that two employees were not similarly situated because, *inter alia*, one employee's malfeasance had been substantiated while the other's had not).

[47]R.25-6 at 4, 5, 10 (King Report).

employer's treatment of them for it." *Russell*, 537 F.3d at 607 (internal quotation marks omitted).

Therefore, Ms. Collins was not similarly situated to Hampton.

Nor has Ms. Collins produced sufficient evidence that she was similarly situated to Shaw.

Significantly, the record does not reveal whether Martini terminated Shaw for the conduct that King

described in his report.[48] Ms. Collins's claim that Shaw was treated more favorably than she was

is therefore a "bare assertion," which "is plainly insufficient" to survive summary judgment. *See*

*Silverman v. Bd. of Educ.*, 637 F.3d 729, 734 n.2 (7th Cir. 2011).[49]

Therefore, Ms. Collins has failed to establish that Goodwill's proffered reason was a pretext

for sex discrimination. Accordingly, Goodwill is entitled to summary judgment on this claim.

## C. Retaliation

Ms. Collins also asserts that she was subjected to retaliation for sending the February 26

email and for filing a charge of discrimination with the EEOC. However, Ms. Collins has produced

no evidence that Goodwill knew that she had filed a charge with the EEOC before it terminated her.[50]

---

[48]The record contains only King's "[r]ecommendation[]" that, "[a]t a minimum," Martini counsel Shaw regarding how to interact properly with disabled employees. *Id.* at 12. Ms. Collins has introduced no evidence of what Martini did with this recommendation.

[49]We note that one of the employees who complained about Shaw during King's investigation previously had raised a similar complaint to Walker. R.25-2 at 41-42 (Walker Dep. 110-11). Walker testified that he did not discipline Shaw for this alleged misconduct because there was "[n]o proof . . . except for her making the allegation." *Id.* at 43 (Walker Dep. 112). This evidence is similar to what Ms. Collins introduced with respect to Hampton, and it suffers from the same infirmities. Accordingly, this evidence does not merit separate discussion.

[50]The only evidence of record as to when Goodwill learned of the charge is the Notice of Charge of Discrimination that the EEOC sent to Goodwill on April 16, 2009, well after Goodwill

Of course, Goodwill could not have retaliated against Ms. Collins for filing a charge unless it was aware that she actually had done so. *See Mulhall v. Ashcroft*, 287 F.3d 543, 551-52 (6th Cir. 2002). Furthermore, in her email to her supervisors at Goodwill, Ms. Collins complained only about "feel[ing] threaten[ed]."[51] Because the email did not reference any alleged act of sex discrimination or sexual harassment, it did not amount to protected activity for purposes of Title VII's anti-retaliation provision. *See Fox v. Eagle Distrib. Co.*, 510 F.3d 587, 591 (6th Cir. 2007) ("In order to receive protection under [a retaliation provision], a plaintiff's expression of opposition must concern a violation of the [statute]."). A "vague charge that [the employer's] management [i]s out to get [the employee] is insufficient to constitute opposition to an unlawful employment practice." *Id.* at 592 (internal quotation marks omitted). Accordingly, these claims fail as well.

**D.  Intentional Infliction of Emotional Distress**

Ms. Collins's final claim is that Goodwill intentionally inflicted emotional distress upon her. As with the previous claims, Ms. Collins has failed to produce sufficient evidence to allow a rational trier of fact to find in her favor on this claim. A defendant's conduct will give rise to liability under this tort only if it is "so outrageous that it cannot be tolerated by civilized society." *Lourcey v. Estate of Scarlett*, 146 S.W.3d 48, 51 (Tenn. 2004). The conduct in this case does not rise to that level. *See Jones v. Tennessee Valley Auth.*, 948 F.2d 258, 266 (6th Cir. 1991) (affirming summary judgment where the "plaintiff's supervisors intimidated him by assigning him to menial tasks,

_____

had terminated Ms. Collins. *See* R.31-3.

[51]R.25-7.

-18-

unfairly reprimanded him, gave him [a] low performance appraisal, monitored [certain of] his communications . . . , attempted to gain his medical records, and barred him from promotions, bonuses and raises"). "To hold otherwise would result in every discrimination claim also being an outrageous conduct claim." *Bellomy v. AutoZone, Inc.*, No. E2009-00351-COA-R3-CV, 2009 WL 4059158, at *11 (Tenn. Ct. App. Nov. 24, 2009).

## CONCLUSION

For the foregoing reasons, we AFFIRM the judgment of the district court.